Daniel E. Fitzpatrick, J.
This is a small claim. Despite this classification we should not be in haste to look down our noses at it. Just as a little acorn may contain a great oak, so this small claim contains the application of some very great principles.
The only direct testimony in this action on the salient facts is that of the plaintiff. The testimony of the police officer, the defendant’s only witness, consists of direct testimony about after the event occurrences, and hearsay as to what transpired before his arrival on the scene. The uncontradicted testimony *950 of the plaintiff is to the effect that outside his home he saw some men dumping the rubbish and garbage from the cans he had put out a short time before; that he remonstrated with them and asked them to stop what they were doing and replace the debris; that they threatened him and called him a name that reflected upon his race and ancestry; that as they advanced he retreated into the hallway, that they came in after him, still menacing him, that he retreated further into his apartment and locked the door, that they broke in the door and entered his apartment. He withdrew further into another room and there, getting possession of a hunting rifle which he owned, he ordered them out. They left his apartment still threatening him, and took up a position in the common hall. That he opened the door leading' to the hall from the rear room where he had sought shelter, and leveling the gun ordered them to leave. They refused and he fired the gun into the ceiling. They then retired to “ prepared positions ” (as military phraseology has it), out on the sidewalk.
It is claimed that a woman and a child were slightly injured by ricocheting of the pellets, but there is no testimony in support of this last. The plaintiff claims he returned to his apartment and called the police; that the officer receiving the call asked him if anyone was shot, and he said he did not know. That he then held the crowd at bay until the arrival of the officers.
The officer, who was the only other witness in the case, testified that upon arrival the plaintiff was on the sidewalk with his gun levelled at the crowd which was angrily surrounding him; that the officer took the plaintiff inside the house, disarmed him, and then, for his own safety, removed the plaintiff in a patrol car to the station house; that they there questioned him for the first time about the event. Asked by this court why they did not question him at the scene, the officer said because the situation was one of danger and that their main object was to get the plaintiff away in safety and disperse the crowd. This procedure the court applauds, and stated for the record that the Police Department was to be commended for their handling of this affair. The officer also testified that the plaintiff was on the sidewalk about 100 or more feet from the front doorway of his home; that a woman and child claimed to have been injured by a shot fired by the plaintiff; that his investigation showed that the plaintiff could not have fired from his apartment doorway, but must have gone into the hall and then fired the shot at the hallway ceiling at a point in the hallway opposite his own doorway; that after talking to the people at the scene, they claim they were going to a party upstairs, in the house *951 where plaintiff has his apartment on the ground floor; that he asked to be invited to the party; that when he was refused he got his gun and drove them out, saying, “ No one could go to the party if he was not to be invited.” The officer admits that all this is secondhand and hearsay, that he knows none of this of his own knowledge. He also testified that his investigation showed that plaintiff’s apartment door had been forced and broken open.
It is significant that no evidence was given by the people allegedly driven out by the plaintiff or by those claiming to have been injured, or who were allegedly giving the party upstairs. They were not produced upon the trial. They hover vaguely in the background of the testimony, muttering direful threats and charges, like an ancient Greek chorus. There is no intimation of their race, creed, color or anything else by which they might be identified.
The plaintiff was thereafter charged with felonious assault and discharging a gun within the city limits, the latter being a violation of the Administrative Code. (Administrative Code of City of New York, § 436-5.0, subd. c.) His hunting gun was turned over to the Property Clerk of the City of New York, pending the outcome of any trial or hearing. (Administrative Code, § 435-4.0, subd. b.) It is of further significance that the evidence indicates that when the time came for a hearing before the Grand Jury, no one appeared against the plaintiff. The charges were dropped and he was given a release by the District Attorney, to deliver to the defendant, Property Clerk, for the return of his rifle. The Property Clerk has refused to return the gun, and as a consequence the court has the present action before it.
The basis of the Property Clerk’s resistance to the plaintiff’s claim is that the gun was used in the commission of a crime and is therefore forfeit. (Administrative Code, § 435-4.0, subd. e.) Passing for the moment that the law, as a matter of broad policy, frowns on forfeiture, there is the constitutional guarantee of the right of the individual to bear arms. (U. S. Const., 2d Arndt.) Further, our Penal Law and Criminal Code reaffirm the right of an individual to a presumption of innocence until found guilty by a court of competent jurisdiction (Code Grim. Pro., § 389), and a very basic right, long recognized in the Anglo-American jurisprudence, and incorporated into our own Penal Law, namely the elemental right of self-defense. (Penal Law, §§ 42, 1055, subd. 1.) Against this array of talent the Corporation Counsel opposes the provisions of the Administrative Code of the City of New York, cited above. The *952 Corporation Counsel insists that since the gun was used in the commission of a crime, that the defendant is not entitled to its return, and that this court must be satisfied by evidence produced by the plaintiff that he did not commit a crime before it can order his gun returned to him. To the court this seems to beg the very fundamental question as to whether the plaintiff was guilty of any crime at all, and to throw upon the plaintiff the burden of proving his own innocence. A procedure totally unknown to Anglo-American juridical thought. In fact, the Corporation Counsel seems to be under the spell of the Queen of Hearts in Alice in Wonderland, who, at the trial before the King insisted, “ Sentence first, verdict afterward.” “ Stuff and nonsense! ” said Alice loudly. “ The idea of having a sentence first! ” “ Hold your tongue! ” said the Queen, turning purple. “I won’t!” said Alice. “ Off with her head! ” the Queen shouted at the top of her voice. This court recognizes no such rule of law as enunciated by the Queen, and has no intention of applying it in this instance, must less ordering anyone’s decapitation, figuratively or otherwise.
In answer to the court’s question as to whether this man under the circumstances did not have a right to defend himself, the Corporation Counsel asked in turn if the court was going to pin a medal on this man. The obvious answer is that this court has no appropriation for any such medal, but if it did it would seriously consider having one struck off. In these days of summit conferences, mass picketing, astronomical measurement in light years, the billions of ergs released by nuclear fission, mobs of juvenile delinquents, and the national passion for anonymity, it is serendipity to once again behold the re-emergence of the individual rampant under time honored circumstances. It might be well for all to note once again at this point that a man’s home is his castle, and that intruders act at their peril.
The plaintiff’s whole conduct on the credible testimony is that of a man in a situation of danger, and that he acted consistently like one fending off bodily harm and not like one bent upon the commission of crime. To so hold in this case would be tantamount to finding the plaintiff guilty of a crime, of which no witness testified against him, and for which no one appeared before the Grand Jury, that body refusing to indict. If the civil courts had this power, what then is to become of the constitutional guarantees and the presumption of inno-. cence? There is here no conviction beyond a reasonable doubt. Yet to seek a forfeiture by the civil rule of fair preponderance of evidence seems to this court not only to violate *953 our conceptions of constitutional law, but to contravene the highest Anglo-American sense of fair play.
The Corporation Counsel argues that certain discrepancies in the plaintiff’s testimony compel this court to find against him. He urges that the testimony of the police officer shows that the gun could not have been fired from the position plaintiff testified, and that he was found on the sidewalk leveling the gun at an angry crowd, 100 or more feet outside his house. Assuming that these discrepancies exist, they are certainly not controlling in the face of other agreements in the testimony, which must be opposed to them. The testimony is in agreement that a crowd was opposing the plaintiff, who stood like the embattled farmer, until the arrival of the police. That his apartment had been broken into, that the gun was fired into the ceiling, albeit, not at the point stated by the plaintiff; that he held at bay people who apparently had no business on his premises; that the police considered the situation one of danger, and that they took plaintiff away in a patrol car for his own safety. That the plaintiff believed himself in a position of imminent peril and bodily harm, does not seem to stretch the imagination or do violence to the reasonable interpretation of the evidence in this case. In fact, the court might be constrained to find that the actions of the plaintiff averted a greater catastrophe.
In the face of the Corporation Counsel’s insistence upon the provisions of the Administrative Code forbidding the discharge of firearms within the city limits, the court suggests that anyone in a situation of immediate peril is not going to stop to look up the Administrative Code to ascertain whether or not he may fire a rifle within the city limits. To so hold would be to give lip service only to the constitutional guarantees.
The Constitution permits citizens the right to bear arms. It is well known that next to his horse, the possession most valued by the pioneer was his gun. It was often his only guarantee against premature baldness at the hands of whooping Indians bent upon avenging wrongs, real or imagined, their courage heightened by liberal doses of “ fire water.” In the best tradition, the gun normally rested above the fireplace, there to be seized dramatically in times of attack by the pioneer, his stalwart sons, or by the noble women of the family, particularly a pipe-smoking, cussing “ Grandmaw,” who according to the westerns, could outshoot Daniel Boone or Davy Crockett, and often did. The founding fathers therefore wisely risked no major crises within the new nation by rashly depriving the pioneer or patriot of his right to retain his rifle, thereby pre *954 serving domestic tranquillity and the infant population from the depredations of outraged natives. In fact, today, in modern so-called ranch homes, we see these guns above the fireplaces in a nostalgic, if tenuous identity with a more robust age. Likewise, the city fathers, with due concern for the growing city masses, and with an eye to Federal appropriations dependent upon the census enumeration, unable because of the constitutional guarantee to prevent the citizen from having his rifle or gun, forbade the discharging of the same within the city limits. It would certainly not be cricket, as well as dangerous to allow citizens to discharge weapons in a crowded subway. And the provisions of the Administrative Code are therefore, in that regard, valid and binding. The question here is what is their effect in a situation like that before the court.
The Corporation Counsel insists that the Administrative Code is entitled to great weight. It undoubtedly is, but in this court’s humble opinion it is in this instance fighting out of its division, and is hopelessly outclassed by the Constitution and the Bill of Rights.
This court therefore finds in fayor of the plaintiff upon all the issues involved, and directs that the Property Clerk return the plaintiff’s property to him, and that judgment may be entered accordingly. This cause is set down for October 19, 1960, for evidence on the value of the gun or rifle only.