Argued February 28, affirmed September 28, 1966, United States
Supreme Court denied certiorari February 27, 1967

# STATE OF OREGON, *Respondent, v.* MAURICE WHEELER CARTWRIGHT, JR., *Appellant.*

418 P. 2d 822

122

*Lawrence A. Aschenbrenner,* Public Defender, Salem, and *Howard R. Lonergan,* Portland, co-counsel, argued the cause and filed briefs for appellant.

*George M. Joseph,* Deputy District Attorney, Portland, argued the cause for respondent. With him on the brief was George Van Hoomissen, District Attorney, Portland.

Before McAllister, Chief Justice, and Perry, Sloan, Goodwin, Denecke, Holman and Lusk, Justices.

LUSK, J.

The defendant, Maurice Wheeler Cartwright, Jr., is an ex-convict who was convicted of the crime of possession of a pistol in violation of ORS 166.270,[1] and has appealed.

---

[1] ORS 166.270: "Any unnaturalized foreign-born person or any person who has been convicted of a felony against the person or property of another or against the Government of the United States or of this state, or of any political subdivision of this state, who owns, or has in his possession or under his custody

Defendant assigns numerous errors, one of which raises the important question of the validity of a search and seizure made under a search warrant which was issued on the basis of information obtained by eavesdropping, not with the aid of any electronic device. The pistol designated in the indictment was seized in the search and error is assigned to the court's denial of a motion to suppress its use as evidence.

*Alleged illegality of search warrant.*

It appears that Orville Luther, a deputy sheriff for Multnomah County, having reason to suspect that the defendant and his wife, Judith (sometimes referred to in the record as Judith Hardin), were in possession of narcotics at their place of abode at 8304 SE Brooklyn Street in Portland, on July 14, 1964, rented an apartment in the adjoining house, 8302 SE Brooklyn Street, and over a period of eleven days, with other officers, listened at the party wall to conversations between the defendant and his wife. On July 21, 1964, Luther swore to an affidavit reading as follows:

"I am a deputy sheriff for Multnomah County, Oregon, and in such capacity and pursuant to an undercover investigation, I have rented an apartment at 8302 S. E. Brooklyn Street, in the County of Multnomah, State of Oregon, and have been residing there since July 14, 1964; that there resides in the adjacent apartment in the same building, 8304 S. E. Brooklyn Street, one Maurice Cartwright and one Judith Hardin; that both of these subjects are known to me as narcotics users; that I have personally seen these subjects in company with

or control any pistol, revolver, or other firearm capable of being concealed upon the person, or machine gun, shall be punished upon conviction by imprisonment in the penitentiary for not more than five years."

other known narcotics users enter and depart from 8304 S. E. Brooklyn Street at late and unusual hours on many occasions;

"That I have personally overheard through the walls of the said apartment conversations carried on by the said Maurice Cartwright and Judith Hardin relating to their present possession of narcotics; that based upon these conversations which I have overheard I have good reason to believe that there is presently in the possession of the said Maurice Cartwright and Judith Hardin in the aforementioned premises at 8304 S. E. Brooklyn Street, the following personal property:

"26 capsules of heroin, and assorted quantities of Methedrine, Tuinal and Cocaine.

That this property is possessed by them in violation of ORS 474.020 and ORS 475.100."

On the basis of this affidavit a district judge for Multnomah County issued a warrant for a search of the premises occupied by the Cartwrights. The warrant was executed by Luther, assisted by other officers, on July 25, 1964. In addition to the pistol and clip, containing six rounds of ammunition, a quantity of narcotics, hypodermic needles and other equipment used by narcotic addicts, was taken in the search.

■ Since the decision in *Mapp v. Ohio,* 367 US 643, 81 S Ct 1684, 6 L ed 2d 1081, 84 ALR2d 933 (1961), the Federal rule excluding evidence obtained in violation of the provisions of the Fourth Amendment of the Constitution of the United States[2] must be applied

---

[2] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

in criminal prosecutions in the state court: *Schmerber v. California,* 384 US 757, 86 S Ct 1826, 16 L ed 2d 908 (1966) ; *State v. Krogness,* 238 Or 135, 138, 388 P2d 120 (1963).

In the *Schmerber* case, the Supreme Court's most recent decision upon the subject, it was held that, under the "stringently limited conditions" there shown, blood might be taken from a person under arrest against his will, to be analyzed for alcoholic content, without violating the right of privacy protected by the Fourth Amendment. In this context the court said:

> "* * * the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner."

■ The question here is whether the conduct of the officers in listening to the conversations between the defendant and his wife in the constitutionally protected area of their home was an unjustified intrusion upon the defendant's privacy. If so, the information thus obtained could not be the basis of a valid search warrant: *McGinnis v. United States,* 227 F2d 598, 603 (1st Cir) ; *Fraternal Order of Eagles, No. 788 v. United States,* 57 F2d 93, 94 (3d Cir).

Unlike the present case, all the eavesdropping decisions of the Supreme Court deal either with wiretapping or the use of some kind of an electronic device. The decision in the wiretapping case of *Olmstead v. United States,* 277 US 438, 48 S Ct 564, 72 L ed 944, 66 ALR 376 (1928), rejecting the claim of an unlawful search and seizure, was based on the grounds that there was no "actual physical invasion" of the premises occupied by the defendants (277 US at 466) and

no search or seizure of material things, but only the securing of evidence "by the use of the sense of hearing." Id. at 464. It was further stated:

"The reasonable view is that one who installs in his house a telephone instrument with connecting wires intends to project his voice to those quite outside, and that the wires beyond his house and messages while passing over them are not within the protection of the Fourth Amendment." Id. at 466.

Despite frequent attacks, both from within and without the court, upon the *Olmstead* decision, it remains the law of the land, though the notion that the Fourth Amendment prohibits unreasonable searches and seizures of only material things has been repudiated: *Irvine v. California,* 347 US 128, 74 S Ct 381, 98 L ed 561 (1954) ; *Silverman v. United States,* 365 US 505, 81 S Ct 679, 5 L ed 2d 734 (1961) ; *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L ed 2d 441 (1963) ; *Clinton v. Virginia,* 377 US 158, 84 S Ct 1186, 12 L ed 2d 213 (1964) ; as has the distinction based on whether the speaker intended his conversation to be confined within the four walls of the room in which he talks: *Goldman v. United States,* 316 US 129, 62 S Ct 993, 86 L ed 1322 (1942).

In *Goldman* the officers eavesdropped with the aid of a detectaphone placed against the wall of a room adjoining that in which the defendant and others were talking. There was no trespass and the court held, on the authority of *Olmstead,* that there was no violation of the Fourth Amendment.

In *Irvine* a concealed microphone was installed in the defendant's home by the police, who had obtained entry to the home illegally for this purpose while the defendant and his wife were away. Evi-

dence of conversations overhead by the police through the aid of the microphone and accompanying installations was held to have been obtained by an illegal search and seizure, but, as the case arose prior to *Mapp v. Ohio* and the prosecution was in a state court, admission of the evidence was held not erroneous.

In *Silverman* the officers employed a so-called "spike mike" to listen to what was going on within the four walls of the house next door. The instrument in question was a microphone with a spike about a foot long attached to it, together with an amplifier, a power pack and earphones. The spike mike was inserted in the party wall and made contact with a heating duct serving the house occupied by the defendants, thus converting their entire heating system into a conductor of sound. The court held there was a violation of the Fourth Amendment and that evidence of what the officers heard by the means employed was erroneously admitted.

In *Clinton* the Supreme Court reversed a decision of the Supreme Court of Virginia which held admissible evidence of conversations overhead by eavesdropping officers: *Clinton v. Commonwealth,* 204 Va 275, 130 SE2d 437 (1963). As stated in the opinion of the Virginia Court, a witness testified that the instrument used was a "spiked device," but from further testimony the Virginia Court concluded that it was the same sort of device used in *Goldman*: 204 Va at 281-282. The Supreme Court disposed of the case in a *per curiam* opinion which, in addition to denying a motion to strike the supplementary brief of the respondent, reads: "The judgment is reversed. *Silverman v. United States,* 365 US 505; *Ker v. California,*

374 US 23." Mr. Justice Clark concurred in the following words:

"Since the court finds that the 'spiked' mike used by the police officers penetrated petitioner's premises sufficiently to be an actual trespass thereof, I join in the judgment."

The defendant contends that *Silverman* and *Clinton,* considered together, have overruled *Olmstead* and *Goldman,* and constitute, in effect, a holding that the requirement of a trespass has been abandoned by the Supreme Court.

We do not agree. In this we are in accord with the United States Court of Appeals for the Second Circuit in *United States v. Pardo-Bolland,* 348 F2d 316, 321-323 (1965). The court there characterized both *Silverman* and *Clinton* as "spike" mike cases and held, in a case of electronic eavesdropping where there was no technical trespass, that *Goldman* was controlling. While, in *Silverman,* the court said that "we need not pause to consider whether or not there was a technical trespass under the local property law relating to party walls": 365 US at 511, the opinion emphasized that the eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied by the accused. Id. at 509. The court expressly refused to re-examine *Goldman* and *On Lee v. United States,* 343 US 747, 72 S Ct 967, 96 L ed 1270 (1952).[9] We are unwilling to believe that, after having

[9] An "undercover agent" for the Federal Bureau of Narcotics, equipped with a concealed microphone and antenna, engaged a suspect in conversation in the latter's place of business, a laundry. The conversation, thus broadcast, was listened to on a radio receiver outside the laundry by another agent, who was permitted to testify to incriminating statements made by the suspect in the latter's trial for violation of the narcotics law. Because the under-

repeatedly declined invitations to overrule prior decisions of long standing, the Supreme Court has chosen to do so without argument in a one sentence *per curiam* opinion.

So far, we have assumed that there is no legal distinction, in respect of the application of the Fourth Amendment, between electronic eavesdropping and eavesdropping without such aid.

There is nothing definitive in the decided cases upon that question nor in the voluminous literature, some of which is cited in the margin.[2] A few decisions in the lower Federal courts and in California deal with spying, which is conduct analogous to eavesdropping. In *McDonald v. United States,* 83 US App DC 96, 166 F2d 957 (1948), a policeman, by looking through a transom in a house which the officers had forcibly entered, saw the defendant engaged in violation of a lottery law. The Government claimed a lawful arrest, and a lawful search pursuant thereto. The court said: "It was not gentlemanly to spy on McDonald in that manner, but his constitutional rights were not thereby invaded." Cases were cited to support this statement. On certiorari the Supreme Court bypassed this ques-

cover agent was in the laundry with the permission, if not at the invitation of the defendant, the search was held lawful. A similar case is Lopez v. United States, 373 US 427, 83 S Ct 1381, 10 L ed 2d 462 (1963).

[2] Dash, The Eavesdroppers; Beaney, "The Constitutional Right to Privacy," The Supreme Court Review, 1962, 218, 251; Wiretapping and Eavesdropping, A Symposium, 44 Minn L Rev 813; Eavesdropping, 50 Minn L Rev 378; Kaplan, Search and Seizure, 49 Calif L Rev 474, 482-485; Eavesdropping Orders, 66 Col L Rev 355; The Problem of Electronic Eavesdropping, Joint Committee on Continuing Legal Education of the American Law Institute and the American Bar Association (1961); 11 New York Law Forum 328; Templar, Admissibility of Evidence, 5 Washburn L Jnl 174.

tion: *McDonald v. United States,* 335 US 451, 69 S Ct 191, 93 L ed 153 (1948). The judgment of conviction was reversed, not because the spying was in itself an unlawful search, but because the arrest of the defendant and seizure of the evidence were without a search warrant and there were no compelling reasons to justify its absence. Mr. Justice Jackson concurred specially on the ground that the officers were trespassers in the house. In the course of his opinion he said:

"* * * Had the police been admitted as guests of another tenant or had the approaches been thrown open by an obliging landlady or doorman, they would have been legally in the hallways. Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain. If in this manner they, or any private citizen, saw a crime in the course of commission, an arrest would be permissible." 335 US at 458.

It may be noted that ORS 167.170 makes unlawful an invasion of privacy by "peeping" or "peering," but excepts "a police officer engaged in the lawful pursuit of his official duties."

The California court has held that spying into public toilets, in circumstances of extreme aggravation, to obtain evidence of homosexual offenses, was a violation of the Fourth Amendment and the evidence thereby obtained inadmissible: *Bielicki v. Superior Court,* 57 Cal 2d 602, 2 Cal Rptr 552, 371 P2d 288 (1962); *Britt v. Superior Court,* 58 Cal 2d 469, 24 Cal Rptr 849, 374 P2d 817 (1962). On similar facts, however, the United States Court of Appeals for the Ninth

Circuit reached a contrary conclusion in *Smayda v. United States,* 352 F2d 251 (1965).

Electronic eavesdropping is a phenomenon concerning which there is widespread and justifiable public concern. The Supreme Court in *Silverman,* speaking through Mr. Justice Stewart, commented upon the "frightening paraphernalia which the vaunted marvels of an electronic age may visit upon human society": 365 US at 509. Mr. Justice Brennan dissenting in *Lopez,* 373 US at 466, wrote: "Electronic aids add a wholly new dimension to eavesdropping." And in *Irvine* the court, speaking through Mr. Justice Jackson said: "Science has perfected amplifying and recording devices to become frightening instruments of surveillance and invasion of privacy, whether by the policeman, the blackmailer, or the busybody": 347 US at 132. In Oregon, as in some other states, statutes have been enacted to control electronic eavesdropping: ORS 141.720-141.740; 165.535-165.545.

■ Conventional eavesdropping (if this is the proper term for it) is not, apparently, much indulged in by the police, and it is not to be compared as a menace to the privacy, whether of law-abiding persons or of criminals, with the use of modern electronic devices. While the practice of eavesdropping or "cutting in" on a telephone was characterized by this court in *DeLore v. Smith,* 67 Or 304, 308, 132 P 521, 136 P 13, 49 LRA NS 555, as "most despicable," yet evidence so obtained was held admissible. No Oregon statute prohibits conventional eavesdropping.[9]

---

[9] It is suggested in the defendant's brief that eavesdropping was an indictable common law offense and prohibited by the Oregon nuisance statute: ORS 161.310.

"Eavesdroppers, or such as listen under walls or windows or the eaves of a house to harken after discourse, and there-

Professor Beaney, op. cit. 233-234, in his discussion of the *Silverman* case, asks: "But is it not the intention of all electronic eavesdropping to make an 'auditory trespass'?" There is a similar suggestion in *United States v. Stone*, 232 F Supp 396, 399 (ND Tex 1964):

> "Privacy of a protected area [in earlier times] was invaded only by an actual physical intrusion. But today electronic devices without physical presence enable an intrusion upon the air, light and sound waves of a person's property as real as any physical trespass."

We have no occasion to inquire whether in these observations may be found a sound basis for drawing a distinction between conventional eavesdropping and electronic eavesdropping in their relationship to the application of the Fourth Amendment. It must be enough for us that on the question of Federal constitutional law before us the Supreme Court has spoken and this court is bound by its decisions. In this case the officers were in a place where they had a right to be. They committed no trespass, technical or otherwise, and the information they gained by listening at the wall could properly be made the basis for the issuance of a search warrant.

Whether the Supreme Court eventually will adopt the views expressed in numerous strongly worded dissents which have been pressed upon us in argument, is a matter of sheer speculation, for, as Mr. Justice

---

upon to frame slanderous and mischievous tales, are a common nuisance * * *." 4 Blackstone 1340 (Cooley).

The definition requires that the act be habitual: Dash, op. cit. 426, 471, Note 190; State v. Davis, 139 NC 547, 51 SE 897, 111 Am St Rep 816 (1905). The activities of the officers in this case do not come within the definition. See Law Commission Proposals to Abolish Certain Ancient Criminal Offences (1966) p. 3.

Harlan said in his specially concurring opinion in *Ker v. California,* 374 US 23, 45, 83 S Ct 1623, 10 L ed 2d 726 (1963) : "[T]his Court's decisions in the realm of search and seizure are hardly notable for their predictability." See, also, Mr. Justice Frankfurter, dissenting, in *Elkins v. United States,* 364 US 206, 239, 80 S Ct 1437, 4 L ed 2d 1669 (1960) ; *Irvine v. California,* supra, 347 US at 134.

■ The defendant further contends that the affidavit of Deputy Luther was insufficient because the statement in it that the officer overheard conversations of the defendant and Judith Hardin "relating to their present possession of narcotics" could be taken to mean that they denied possession of narcotics. According to the affidavit, the persons named were talking about their present possession, not their non-possession, of narcotics. The magistrate who issued the search warrant was entitled to give the language of the affidavit its obvious meaning. He was not required to speculate that the affiant may have intended the opposite of what he said. See *State v. Tacker,* 241 Or 597, 407 P2d 851; *United States v. Ventresca,* 380 US 102, 108, 85 S Ct 741, 13 L ed 2d 684.

■ There was no error in denying the motion to suppress or in admitting the pistol in evidence.

*Claimed unconstitutional application of ORS 166.270.*

■■ Defendant moved for a directed verdict of acquittal on several grounds. Before discussing them we deem it advisable to comment on the fact that the motion was not made until after the court had instructed the jury and counsel for the defendant was taking his exceptions. We do not approve of this practice. The motion should be made at the conclusion of all the testimony and prior to the argument of counsel. It

may also be made under ORS 136.605 before presentation of evidence in defense without waiving the right to introduce evidence in defense and also without waiving the right to move for a judgment of acquittal at the conclusion of all the testimony. There may be a serious question as to whether the defendant's right to move for a judgment of acquittal is not waived by postponing the making of the motion until after the charge of the court. Since, however, the state has not urged the point, we will consider the motion on its merits.

The first ground is that ORS 166.270 is not applicable to this case because of the asserted right under Article I, Section 27 of the Constitution of Oregon[®] of every person, including convicted felons, to carry a pistol for purposes of self-defense. It is claimed that, in the circumstances of this case, to sustain the defendant's conviction would involve an unconstitutional application of the statute.

The circumstances, as related by Mrs. Cartwright, who testified for the defendant, were that the pistol was left with her by some friend as security for a loan; that she and the defendant had been warned that there were two men who were coming out to rob them, and her husband was instructing her in the use of the pistol against this threatened invasion of their home. Also, Detectives Elliott and Grohs, who participated in the eavesdropping, testified to overhearing a quarrel between the defendant and his wife when he was trying to induce her against her will to shoot a pistol.

In support of their theory counsel for defendant have cited, among other authorities, Machiavelli's,

---

[®] "The people shall have the right to bear arms for the defence (sic) of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

"The Prince;" The Dialogues of Plato; Rousseau's, "A Discourse on Political Economy;" and Adam Smith's "The Wealth of Nations." More to the point is authority nearer home, particularly the opinion of Mr. Justice ROSSMAN in *State v. Robinson,* 217 Or 612, 343 P2d 886, in which, after a review of the adjudicated cases, this court held that notwithstanding Article I, Section 27, the state, in the exercise of the police power, may provide that the ownership or possession of certain firearms by an exconvict is a public offense; for the Legislature might reasonably conclude that, in the generality of cases, a person who had demonstrated his disregard for the laws of society by committing a felony against the person or property of another would be more likely than others to resort to force and violence and would be a greater threat to the public safety when in possession of a concealable firearm than when not.

■ But defendant argues that the *Robinson* case is not controlling because no claim was there made based on the right of self-defense. We agree that there may be innocent possession of a concealable firearm by an exconvict as was decided in cases cited by the defendant. For example, it was held in *People v. Furey,* 13 AD2d 412, 217 NYS2d 189, that finding and carrying a weapon by an exconvict for the purpose of delivery to the police was not a crime.

Akin to this ruling is that in *Hutchinson v. Rosetti,* 24 Miscl 2d 949, 205 NYS2d 526, which involved the alleged violation of a city ordinance prohibiting the discharge of firearms within the city limits. The ordinance was held not to apply to a man who, when forced to defend his home and person against an unprovoked trespass and assault by several other men, fired his hunting rifle into the ceiling of the room

in order to scare his assailants away. We may add that the classic instance where a court refused to apply the letter of the law in order to avoid an unjust and absurd result, is the case mentioned by Puffendorf and referred to in *Holy Trinity Church v. United States,* 143 US 457, 461, 12 S Ct 511, 36 L ed 226.

■ But we are not required to consider here the hypothetical case of an exconvict, faced with a sudden onslaught and immediate threat of great bodily harm or possible death, who seizes a pistol within his reach for the purpose of defending himself. This is not that kind of a case. The defendant was forewarned that two men were going to rob him. There is nothing to suggest that he did not have ample time to seek police protection, but he did not seek it. He chose, instead, to keep himself armed with a pistol—the very thing that the statute prohibits.

Moreover, the statute does not prohibit the possession by an exconvict of any and all firearms, but only a pistol, revolver, or other firearm capable of being concealed on the person, or a machine gun. It would have been perfectly legal, so far as the statute is concerned, for the defendant to have provided himself with a rifle or shotgun for the purpose of protection against a threatened robbery.

■ Although it was not stated on the trial as a ground of the motion, the defendant has argued in his brief that the statute, as applied, is in conflict with the Second Amendment of the Constitution of the United States,[⑦] which also declares the right of the people to keep and bear arms. The contention is not properly before us and we need consider it no further than to

---

[⑦] "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

say that the Second Amendment is a limitation only upon the power of the Congress and the national government and not that of the state: *Presser v. Illinois,* 116 US 252, 255, 6 S Ct 580, 29 L ed 615; *Miller v. Texas,* 153 US 535, 538, 14 S Ct 874, 38 L ed 812.

Defendant requested an instruction submitting the question of the right of self-defense to the jury. For the reasons above stated, the court did not err in refusing to give the instruction.

### *Claim that the pistol was inoperable.*

The only other ground of the motion for a directed verdict argued in this court is, as stated by counsel for defendant, that "there is no evidence showing that this is a workable revolver."

The only testimony upon this subject was given by Mrs. Cartwright, who, when questioned about her discussion with her husband relative to the two men who, they had heard, planned to rob them, testified:

"Well, my husband—the gun didn't work, or something was wrong with it when the people left it with me, it was faulty, and so—I was scared of guns, and he told me I would just have to point it at them to scare them, and tell them."

Mrs. Cartwright had no familiarity with firearms and it may be questioned whether her evidence is sufficient to support the claim that the pistol could not be fired. Assuming its sufficiency, however, it would not have justified the court in directing a verdict. We think the law upon this subject is correctly stated by Chief Justice Sims, speaking for the court in *Couch v. Commonwealth* (Ky) 255 SW2d 478. The defendant in that case was charged with carrying concealed upon his person a deadly weapon, a pistol. He contended that the Commonwealth failed to prove it was a deadly

weapon when it did not show the pistol was complete with trigger, cylinder, etc., and in condition to fire. The court said:

"In the instant case there was no evidence the pistol was defective and could not be fired. Appellant erroneously argues that as the Commonwealth must prove his guilt beyond a reasonable doubt, it must show the pistol was in such condition that it could be fired at the time it was alleged appellant had it concealed. A pistol is a deadly weapon per se, Skidmore v. Commonwealth, 311 Ky. 176, 223 S.W. 2d 739, and when the Commonwealth proved the accused had it concealed on or about his person, it made out a case. If the weapon was in such defective condition that it could not be fired, that was an affirmative defense which the defendant was called on to prove. Both the Jarvis and Bowman opinions support this legal proposition." 255 SW2d at 479.

Here the weapon is a .32 caliber automatic pistol. At the time it was seized it was fully loaded. To all outward appearances, it is free of any defect which would make it inoperable and is a lethal weapon. The burden of the state to prove that it was a pistol within the meaning of the statute was discharged when it was introduced in evidence, and, if the testimony of Mrs. Cartwright constituted contervailing evidence, the question would become one for the jury. The trial judge did not instruct specifically upon that question, but he was not requested to do so, and the record is not such as to have impelled him to so instruct in the absence of a request.

*Admissibility of incriminating statement by defendant.*

Deputy Sheriff Elliott assisted in executing the search warrant. At the time it was executed another couple besides the Cartwrights were in the latter's

apartment. Elliott testified that when he entered the apartment the defendant was standing in the living room. The defendant made for the bedroom, followed by Elliott, who, with drawn gun, forced him onto the bed. At the head of the bed was a table on which there was a jewelry box. Having learned from the conversations he had overhead that the pistol was probably kept in this box, Elliott opened the box and removed the weapon.

Elliott held up the pistol and asked: "Who owns this weapon?" The question, he testified, was not directed to a particular person, but to "anyone in the dwelling house." The defendant responded: "It's not my gun. I've borrowed it." Elliott immediately placed him under arrest.

Counsel for defendant objected on constitutional grounds to admission of the defendant's statement and assigns error to its admission. He contends that, because the defendant was not advised of his constitutional rights to remain silent and to have counsel, the incriminating statement was not admissible under *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 L ed 2d 977, and *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482. See, also, *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L ed 2d 694, decided since this case was submitted.

■ The state concedes that defendant was "for all practical purposes" under arrest and that he was a focal suspect, but contends that the case is governed by *State v. Shannon,* 241 Or 450, 405 P2d 837, where we sustained the right of police officers coming upon the scene of a crime to "question[s] the persons present to find out what is going on," 241 Or at 454, without first advising them of their constitutional rights. With

this contention we agree. We think it clear that the officer did not interrogate the defendant for the purpose of eliciting a confession from him. His question was addressed to the four persons present in the apartment in the proper course of the officer's duty to investigate a crime. As we said in the *Shannon* case:

"Where there is no coercive conduct by the officers, and no attempt to take unfair advantage of a suspect, the police are entitled to investigate the crime and to use the evidence so obtained, whether the evidence consists of loot, fingerprints, or statements made by a suspect during the commission of the crime or immediately thereafter while the officers are investigating the crime." 241 Or at 454.

See, also, *State v. Randolph*, 241 Or 479, 406 P2d 791.

We hold that there was no violation of the defendant's Fifth or Sixth Amendment rights and that the evidence objected to was properly admitted.

*Evidence of prior conviction.*

On April 15, 1958, the defendant pleaded guilty in the Circuit Court for Multnomah County to an indictment charging him with attempted burglary not in a dwelling. On April 29, 1959, on motion of the district attorney the court ordered the defendant to be brought before it to show cause why his probation should not be revoked. After a hearing the court entered an order, which was recited to be with the defendant's consent, as follows:

"IT IS, THEREFORE, ORDERED and ADJUDGED by the court that the defendant, MAURICE W. CARTWRIGHT, JR. be imprisoned in the Multnomah County Jail for a period of Four (4) Months; and it is

"FURTHER ORDERED and ADJUDGED that upon the termination of the said Four (4) month period, the said MAURICE W. CARTWRIGHT,

JR. be continued on probation to the Oregon State Board of Parole and Probation until the 15th day of August, 1960."

Defendant objected to the admission in evidence of the record showing these matters and contends that it fails to disclose conviction of a felony for two reasons: (1) That probation does not constitute a conviction and (2) a county jail sentence for attempted burglary is void. As to the latter objection, it is sufficient to say that the question is whether the order of probation, following the verdict of guilty, constituted a conviction, within the meaning of ORS 166.270.

The general rule is as stated in *People v. Fabian,* 192 NY 443, 452, 85 NE 672, 127 Am St Rep 917, 18 LRA NS 684:

"As to the numerous cases cited in the briefs of both parties to the present appeal, in which the words 'conviction' and 'convicted' are differently defined, it may be said generally that where the context of the statute refers to the successive steps in a criminal case, or any particular stage of such a prosecution as distinguished from the others, these words apply simply and solely to the verdict of guilty; but where the reference is to the ascertainment of guilt in another proceeding in its bearing upon the status or rights of the individual in a subsequent case, then a broader meaning attaches to the expressions, and a 'conviction' is not established or a person deemed to have been 'convicted' unless it is shown that a judgment has been pronounced upon the verdict."

See, also, *Commonwealth v. Kiley,* 150 Mass 325, 326, 23 NE 55. A contrary view was expressed by Judge Deady in *United States v. Watkinds,* 6 Fed 142, 161.

But the New York and Massachusetts decisions were cases in which, following a verdict of guilty, no judgment whatever was entered. The precise question

here is whether, on a plea of guilty, an order suspending the imposition of sentence and placing the defendant on probation may properly be held a conviction within the meaning of the statute which denounces as a crime the possession or ownership of certain firearms by a person who has been convicted of a felony.

We point out, first, that there is evidence in our statutes calling for an affirmative answer to this question. ORS 137.240 provides, among other things, that conviction of a felony suspends all the civil and political rights of the person so convicted. That section also provides:

"(2) However, a person convicted of a felony may lawfully exercise all civil rights during any period of parole or probation or upon final discharge from imprisonment."

If the legislature had not considered that probation and conviction were equivalents no such provision would have been necessary. Again, in the habitual criminal act the same meaning of the word conviction is recognized, for it is there provided in ORS 168.015 (4) (c) that a conviction is not a "former conviction of a felony" if "(c) It is the defendant's most recent conviction described in subsection (3) of this section, and the defendant was finally and unconditionally discharged from all resulting imprisonment, probation or parole more than seven years before the commission of the principal felony;  *  *  *."

In *State v. Gates,* 230 Or 84, 368 P2d 605, the defendant entered a plea of guilty to a felony charge and was placed on probation. No sentence of fine or imprisonment was imposed. Later, the defendant's probation was revoked and he was sentenced to a term in the penitentiary from which he appealed. The state moved to dismiss the appeal on the ground

that the sentence was not a "judgment on a conviction": ORS 138.040. It was contended that the judgment on conviction was the order placing the defendant on probation. We held that the sentence was an appealable order.

But the reason for the decision was that the only question reviewable on a plea of guilty is whether an excessive fine or cruel and unusual punishment not proportionate to the offense has been imposed: ORS 138.050—a question that could not be raised until sentence had been pronounced. Any other construction would have resulted in such circumstances in a denial of the right of appeal granted a defendant by ORS 138.050. There is nothing in the opinion in that case which lends support to the notion that, for other purposes than the right of appeal, or, even for that purpose, with the sole exception of probation following a plea of guilty, an order of probation is not a conviction. On the contrary, it was stated, *arguendo,* that if the defendant pleads not guilty and on trial is found guilty and the court suspends pronouncement of sentence and puts him on probation, he has an immediate right of appeal. We said "[h]e should not be barred from clearing his name from *a felony conviction* by the act of a court in suspending pronouncement of sentence and putting him on probation." (Italics added.) 230 Or at 95. It was further said:

> "For some purposes, one who has entered a plea of guilty and has been placed on probation may properly be said to have been subject to a 'judgment on conviction.' It is suggested, for example, that if this defendant, when on probation, had been called as a witness and asked on impeachment if he had ever been convicted of a crime, it would have been his duty to answer in the affirmative. * * *"
> 230 Or at 90.

This view has the support of the Supreme Court of the United States. In *Berman v. United States,* 302 US 211, 58 S Ct 164, 82 L ed 204, the defendant was found guilty of a Federal offense and sentenced. Execution of the sentence was suspended and the defendant was placed on probation for two years. He appealed from the sentence and the Supreme Court held, in an opinion by Chief Justice Hughes, that the Court of Appeals erred in dismissing the appeal. The court said:

> "Petitioner stands a convicted felon and unless the judgment against him is vacated or reversed he is subject to all the disabilities flowing from such a judgment." 302 US at 213.

The court was concerned in that case with the question of the finality of the judgment and stated:

> "Here, the imposition of the sentence was not suspended, but only its execution. The sentence was not vacated. It stood as a final determination of the merits of the criminal charge. To create finality it was necessary that petitioner's conviction should be followed by sentence * * * but when so followed the finality of the judgment was not lost because execution was suspended." 302 US at 212.

In *Korematsu v. United States,* 319 US 432, 63 S Ct 1124, 87 L ed 1497, however, the court went further in sustaining the right of appeal. There, acting under a Federal statute after which ours appears to have been modeled, the court placed the defendant on probation and suspended the imposition of sentence. The court referred to the conditions of probation similar to those which the courts of this state may impose under ORS 137.540 and said, quoting from *Cooper v. United States,* 91 F2d 195, 199:

> "These and other incidents of probation empha-

size that a probation order is 'an authorized mode of mild and ambulatory punishment, the probation being intended as a reforming discipline.'" 319 US at 435.

It was further said that "[t]he difference to the probationer between imposition of sentence followed by probation, as in the *Berman* case, and suspension of the imposition of sentence, as in the instant case, is one of trifling degree": Id. And the court concluded:

"Here litigation 'on the merits' of the charge against the defendant has not only ended in a determination of guilt, but it has been followed by the institution of the disciplinary measures which the court has determined to be necessary for the protection of the public." Id.

In accordance with the principles enunciated in these cases, the court in *Ex parte Eng*, 77 F Supp 74 (ND Calif), a habeas corpus proceeding brought by an alien to avoid deportation for violation of the narcotic laws, held that an order of probation and suspension of imposition of sentence was "a sentence as well as a judgment" within the meaning of a statute which provided that no deportation should be made if the judge sentencing the alien "shall, at the time of imposing judgment or passing sentence or within 30 days thereafter," recommend to the Attorney General against such deportation.

That probation is a mode of punishment is also held in *Archer v. Snook*, 10 F2d 567, 569 (ND Ga).

There are decisions the other way, some of them to be found in the Annotation, 5 ALR2d 1080, 1086, § 4, upon the question of what constitutes a former conviction within a statute enhancing a penalty for a second or subsequent offense. In this connection we

call attention to *State v. Commedore*, 239 Or 82, 396 P2d 216, where we held that, notwithstanding the sentence imposed upon the defendant in a prior case was void, the enhanced penalty authorized for a former conviction was properly imposed. The effect of that decision is that a verdict without a judgment may be for some purposes a conviction.

■ In view of the policy behind ORS 166.270, the statute which the defendant is charged with violating, and the reasoning in the cases above cited, we are of the opinion that probation accompanied by suspension of imposition of sentence or suspension of sentence pronounced is a conviction within the meaning of that section. We therefore hold there was no error in admitting the record objected to.

### *Exclusion of officer's report.*

There remain to be considered assignments of error numbers six and seven, which relate to the refusal of the court to allow counsel for the defendant to see a report made by Deputy Sheriff Luther and referred to by him as a witness when under examination by counsel for the defendant during the hearing of the motion to suppress. The basis of the court's ruling apparently was that the report contained confidential matter, the disclosure of which could embarrass other investigations which were being carried on by the police. After the ruling counsel for the defendant asked the court to examine the report and advise him whether it contained anything that would be helpful to the defense, and the court acquiesced. There was no further reference to the matter during the hearing of the motion to suppress. During the trial of the case the report was not referred to until after

the court had instructed the jury and counsel for the defendant was taking his exceptions. He then inquired of the court whether the court had found anything helpful to the defense in the report. The question was not answered.

Whatever the report may have contained, it could have no possible bearing on the merits of the motion to suppress, because the only claim of the defendant (aside from the criticism of the sufficiency of the affidavit) was that the information upon which the search warrant was based was obtained as a result of an illegal search. Both sides were agreed as to how that information was obtained and the question was purely a legal one.

What is now urged upon us, however, is wholly unrelated to the issues involved in the motion to suppress. As stated, the report was never again referred to until all the testmony in the trial had been taken and the jury instructed. The point now sought to be made that counsel was entitled to see the report because it might perchance contain something that would contradict or otherwise weaken the testimony of the officers as to what occurred when the defendant was arrested is not before this court.

The judgment is affirmed.

SLOAN, J., dissenting.

I cannot join in consenting to this kind of insidious police invasion of my home. If they break down my door and enter and ransack, we denounce it. But I would prefer the latter. I at least know they are there and can take means to oust them. I cannot know if they are crouching in the bushes under my window

or listening through the thin wall between my apartment and the next or are tapping my telephone or using electronic eavesdropping devices a block away. By either means no doubt any citizen would condemn himself to some offense, even if it were only a minor violation that could only result in a charge that would cause embarrassment to him or his family.

The majority adheres to the untenable rule of *Olmstead v. United States,* 1928, 277 US 438, 48 S Ct 564, 72 L ed 944, 66 ALR 376, and *Silverman v. United States,* 1961, 365 US 505, 81 S Ct 679, 5 L ed2d 734, that there must be a physical trespass into the home or an intrusion into the walls. I cannot agree.

We know now, not just surmise, that a complete search of our life in our house can be accomplished without any form of physical intrusion. See Dash, The Eavesdroppers (1959), and news accounts of recent hearings by a Congressional Committee indicate that the devices and methods described in The Eavesdroppers may be outdated.

The use of physical trespass as a means to test the extent of the right to personal security from unreasonable search is obsolete and unworkable. We are not required to follow meaningless decisions of the Supreme Court so long as we do not exceed the outer limits fixed by the Court.

More appropriately, we should examine the nature of the right to be protected and the kind of search that violates it.

In the discussions centering around this delicate and difficult subject of the right to privacy it is sometimes asked, what is the nature of the right? Is it some vaguely unexpressed natural right, or does it

spring from the Fourth and Fifth Amendments? Although volumes have been written, Mr. Justice Brandeis has defined the right in these few lines:

> "The protection guaranteed by the Amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." *Olmstead v. United States, supra,* 277 US at 478, 479.

In the same opinion, which is really more of a document of historic significance than an opinion, he gave this prophetic warning:

> "* * * But 'time works changes, brings into existence new conditions and purposes.' Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.

> "Moreover, 'in the application of a constitution, our contemplation cannot be only of what has been but of what may be.' The progress of science in furnishing the Government with means of

espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions. 'That places the liberty of every man in the hands of every petty officer' was said by James Otis of much lesser intrusions than these.* To Lord Camden, a far slighter intrusion seemed 'subversive of all the comforts of society.'* Can it be that the Constitution affords no protection against such invasions of individual security?" *Olmstead v. United States, supra,* 277 US 438, 473, 474. (*Footnotes omitted).

Judge Jerome Frank, also in dissent, has given meaningful expression of need for this protection:

"I grant that, as long as the *Goldman* doctrine endures the domain of Fourth Amendment privacy will be rather restricted, and that it will become more so as new distance-conquering devices for seeing, hearing, and smelling are invented. But I believe that, under the Amendment, the 'sanctity of a man's house and the privacies of life' still remain protected from the uninvited intrusion of physical means by which words within the house are secretly communicated to a person on the outside. A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.* Were my colleagues correct, the Fourth Amendment would be inoperative if a gov-

ernment agent entered a house covered with a 'cloak of invisibility'—a garment which ingenuity may soon yield." *United States v. On Lee,* 193 F2d 306, 315, 316 (USCA2d 1951). (*Footnote omitted).

Another treatise of historical importance is the dissenting opinion of Mr. Justice Brennan in *Lopez v. United States,* 1963, 373 US 427, 83 S Ct 1381, 10 L ed2d 462. In that opinion Justice Brennan also demonstrates the interaction of the Fourth and Fifth Amendments to "create the comprehensive right of privacy." 373 US at 456.

It must be recognized that all three of the cited opinions accept the present necessity of saying that eavesdropping of the kind used in the instant case is probably permissible. The reasoning of these opinions, however, does not justify the distinction. I fail to see any difference in the use of a spike driven into the wall, or a sensitive microphone placed either against the wall or a block away, or the human ear pressed to the outer side of a thin wall. All should be ostracized from permissive invasion.

It would be true that if I openly shout in my house, knowing that it can be heard from without that I could not claim the protection. But that does not mean that I must take my family or guests and "whisper in the bathroom." Jerome Frank's dissent at 193 F2d 306, 317, *supra.*

It is also urged that to prohibit this kind of search would limit the right of the police to keep surveilance on the outside of the house. This need not be so. It is one thing to observe who comes and goes. It is quite another to surreptitiously peep and eavesdrop to the thoughts and opinions stated inside the house. That is a search for evidence, nothing more. It is this kind

of exploratory search that is otherwise prohibited no matter how accomplished. We zealously guard against any other search for evidence only. See *State v. Chinn,* 1962, 231 Or 259, 266, 373 P2d 392. We should exercise greater effort to protect ourselves from the much more dangerous search the majority now approve. For these reasons I dissent.