Argued and submitted October 20, 1993; resubmitted In Banc May 11, affirmed July 20, 1994

In the Matter of
Marcus Orozco, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

Marcus OROZCO,
*Appellant.*

(65848B; CA A77754)

878 P2d 432

Christopher K. Skagen argued the cause for appellant. On the brief was Patrick A. Butler.

Katherine H. Waldo, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

RIGGS, J.

Rossman, J., concurring.

Haselton, J., dissenting.

## RIGGS, J.

In 1992, child was found to be within the jurisdiction of the court for having committed acts that, if done by an adult, would have constituted rape in the first degree. ORS 163.375. The court denied child's request to convert his delinquency petition to a dependency petition and committed him to a juvenile training school. The juvenile court also ordered child to provide a blood sample for DNA testing pursuant to *former* ORS 419.507(11)(a)[1] and ORS 137.076. We review *de novo. Former* ORS 419.561(5); *State ex rel Juv. Dept. v. Qutub,* 75 Or App 298, 706 P2d 962, *rev den* 300 Or 332 (1985).

**1, 2.**    Child first assigns error to the order requiring him to submit a blood sample. He argues that a search authorized by ORS 137.076 violates Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. The proper sequence for analyzing a constitutional claim in Oregon is to look first to state law, including state constitutional law, before reaching a federal constitutional claim. *Sterling v. Cupp,* 290 Or 611, 614, 625 P2d 123 (1981). Statutes are accorded a presumption of constitutionality unless no constitutional construction is possible. *State v. Smyth,* 286 Or 293, 296, 593 P2d 1166 (1979).

*Former* ORS 419.507(11)(a) provided, in part:

"Whenever a child is found to be within the jurisdiction of the court under ORS 419.476(1)(a) for having committed an act which, if done by an adult would constitute a felony offense listed in ORS 137.076(1), the court shall order the child to submit to the drawing of a blood sample in the manner provided by ORS 137.076."

Once the blood is extracted, a genetic profile is developed and added to the database for adult and juvenile sex offenders.[2]

---

[1] ORS 419.507(11)(a) was repealed by Oregon Laws 1993, chapter 33, section 373, re-enacted and recodified at ORS 419C.473(1).

[2] Offenses listed in ORS 137.076 are rape, sodomy, unlawful sexual penetration, sexual abuse, public indecency, incest or using a child in a display of sexually explicit conduct; burglary with intent to commit the above offenses; promoting or compelling prostitution; conspiracy or attempt to commit any felony listed above; murder or aggravated murder.

ORS 181.085(1) provides, in part:

"The Department of State Police is authorized to:

ORS 181.085. Drawing a blood sample implicates Article I, section 9, of the Oregon Constitution, which prohibits unreasonable search and seizure.[3] *State v. Milligan*, 304 Or 659, 748 P2d 130 (1988).

The question before us is whether the search for a DNA "fingerprint" in the blood of sex offenders is reasonable when the DNA is sought for possible use in future criminal investigations. Child argues that it is reasonable for the state to extract blood for evidentiary purposes only if it has a warrant, based on probable cause, or if an exception to the warrant requirement applies. However, the warrant requirement has never been applied to routine searches of convicted or adjudicated persons under state custody. Whether the blood draw is an unreasonable search must be determined with reference to child's right to privacy, which is diminished because he is in post-adjudicated custody.

■ Routine searches of prisoners and probationers without probable cause are reasonable if there is a penological objective. *See State v. Culbertson,* 29 Or App 363, 563 P2d 1224 (1977). Language in *Culbertson* would appear to suggest that a search under ORS 137.076 is unreasonable because its objective is not penological.

> "[P]risoners, even while incarcerated, retain those constitutional rights that are not inconsistent with legitimate penological objectives." 29 Or App at 369.

The state fails to isolate any penological objective for ORS 137.076, *i.e.*, any objective related to the management or mission of a prison. Nevertheless, when the case law and statutes defining the constitutional rights of convicts are read

---

"(a) Store blood samples received under authority of this section, ORS 137.076, 161.325 and 419C.473(1), and autoradiographs and other physical evidence obtained from analysis of such samples;

"(b) Analyze such samples for the purpose of establishing the genetic profile of the donor or otherwise determining the identity of persons or contract with other qualified public or private laboratories to conduct that analysis;

"(c) Maintain a criminal identification data base containing information derived from blood analysis[.]"

[3] *State v. Milligan, supra,* describes a compelled blood test as both a search and a seizure. Defendant's sole challenge to *former* ORS 419.507(11)(a) is that it permits an unconstitutional search.

as a whole, it becomes clear that penological objectives are not the only objectives that justify the infringement of a prisoner's constitutional right.

■ ■ ORS 137.076 searches fall into a narrow class of searches and seizures of prisoners that are performed without probable cause and without a penological objective. These searches and seizures are performed for law enforcement purposes, specifically, to record the immutable characteristics of arrestees and offenders for use in the investigation of future crimes. Included in this class are the fingerprints, palm prints, toe prints and "other personal identifiers" that are seized by law enforcement officers after arrest. ORS 181.511. We are unwilling to say that fingerprinting someone after arrest is an unreasonable seizure.[4] Likewise, we are unwilling to say that drawing a small amount of blood for a DNA "fingerprint" is an unreasonable search when the blood is drawn from a sex offender, after a magistrate has determined that the statutory criteria have been met.[5]

■ While blood-testing is arguably a greater insult to human dignity than fingerprinting,[6] ORS 137.076 surrounds blood-testing with greater procedural safeguards. Like a fingerprint or a voice exemplar, blood-testing is a nontestimonial record of physical characteristics and involves "none of the probing into an individual's life and thoughts

---

[4] Fingerprinting has never been analyzed under Article I, section 9. Article I, section 9, is implicated because a person and that person's hands must be seized in order to take fingerprints. In *Davis v. Mississippi*, 394 US 721, 727, 89 S Ct 1394, 22 L Ed 2d 676 (1969), the Supreme Court rejected as improper a police dragnet to seize members of the public for fingerprinting. However, all jurisdictions that have considered the issue have held that fingerprints can be seized from people who are already in custody. *See generally* 5 LaFave, *Search and Seizure* § 5.3(c) (2d ed 1987).

[5] Searches and seizures are separate acts and must be analyzed separately. *State v. Herbert*, 302 Or 237, 729 P2d 547 (1986). However, the definition of "reasonableness" is similar in both contexts.

[6] The dissent argues that (1) blood tests differ from fingerprints because fingerprints, like voice exemplars, are not "hidden attributes;" and (2) that blood tests involve puncturing the skin. In regard to the first proposition, we take judicial notice of the fact that most people do not walk down the street with magnifying glasses to facilitate scrutiny of their fingerprints. Thus, fingerprints are not "public knowledge" any more than one's DNA is "public knowledge" if they had a bloody nose. In regard to the second proposition, we grant that blood is drawn by puncturing the skin, but the dissent does not persuade us that this difference is a constitutionally significant one. A full body cavity search does not puncture the skin, but arguably has more serious constitutional implications.

that marks an interrogation or a search." *Davis v. Mississippi, supra,* n 4.

■        The dissent argues that drawing blood cannot be analogized to fingerprinting. However, its argument rests on a strained reading of state and federal case law. The dissent reasons as follows: Because *State v. Cullop,* 19 Or App 129, 526 P2d 1048, *rev den* (1974), held that, during his trial, a criminal defendant could be fingerprinted without a warrant, and because *State v. Milligan, supra,* held that blood-testing of a criminal suspect was subject to the warrant requirement, fingerprinting and blood-testing cannot be analogous. This reasoning is unpersuasive. *State v. Milligan, supra,* is inapposite to the case at bar. In *Milligan,* the police drew a blood sample from a suspect as evidence of a particular crime. In this case, the blood is sought from an adjudicated, incarcerated sex offender for identification purposes. The difference in the privacy rights of the defendants and the different purposes behind the blood tests distinguish the test in *Milligan* from the test authorized by ORS 137.076. Compelled blood-testing under ORS 137.076 does not conflict with the holding in *Milligan.*

■        Child next argues that ORS 137.076 violates the Fourth Amendment to the United States Constitution. Under the Fourth Amendment, drawing a blood sample is a search. However, the United States Supreme Court has recognized a number of limited exceptions to the warrant requirement for searches and seizures that involve only a minimal intrusion.[7] When the intrusion incurred by a given search or seizure is minimal, a reviewing court may balance the government's interest in conducting the search, the degree to which the search actually advances that interest, and the gravity of the intrusion upon personal privacy to determine whether the search is reasonable. *Brown v. Texas,* 443 US 47, 50-51, 99 S Ct 2637, 61 L Ed 2d 357 (1979).

■        The minimally intrusive quality of blood extraction has repeatedly been noted. *Cf. Winston v. Lee,* 470 US 753, 762, 105 S Ct 1611, 84 L Ed 2d 662 (1985) ("blood tests do not

---

[7] The court has applied a balancing test for minimally intrusive searches to uphold "stop and frisk" searches, *Terry v. Ohio,* 392 US 1, 20-21, 88 S Ct 1868, 20 L Ed 2d 889 (1968) and brief border searches, *United States v. Martinez-Fuerte,* 428 US 543, 557-60, 96 S Ct 3074, 49 L Ed 2d 1116 (1976).

constitute an unduly extensive imposition on an individual's privacy and bodily integrity"). Prosecuting sex offenses is an important government interest. Taking blood samples for a database for adult and juvenile sex offenders directly furthers that interest. Under *Brown v. Texas, supra,* a search pursuant to ORS 137.076, undertaken to find a DNA "fingerprint," is reasonable and does not violate the Fourth Amendment.

■ Child also assigns error to the treatment of his case as a delinquency matter rather than as a dependency matter. We said in *State ex rel Juv. Dept. v. Bishop,* 110 Or App 503, 506, 823 P2d 1012 (1992), that a juvenile court has discretion to fashion a disposition suited to the individual case. *See also State ex rel Juv. Dept. v. Eichler,* 121 Or App 155, 854 P2d 493 (1993). *Former* ORS 419.474(2) (*repealed by* Or Laws 1993, ch 33, § 373) permitted the juvenile court to fashion appropriate dispositions to promote the welfare of a child within its jurisdiction. In this case, the state established that the dispositional alternatives available under a dependency petition would not serve the child's best interests and, as a result, society's best interests.[8] The trial court did not err in declining to consider an alternative disposition.

Child's remaining assignment of error does not merit discussion.

Affirmed.

**ROSSMAN, P. J.,** concurring.

Although I agree with the majority's conclusion that the constitution is not violated by a statute that requires certain juvenile offenders to provide a blood sample for DNA testing, I would analyze the issue differently.

ORS 419C.473(1) applies to child, because he was found to be within the jurisdiction of the juvenile court for acts which, had they been committed by an adult, would have

---

[8] At the time of the hearing, child had been on probation since November, 1990. His prior adjudications had been for robbery in the third degree, assault in the fourth degree, unlawful possession of a firearm, kidnapping in the first degree, two counts of harassment and two more counts of assault in the fourth degree. In addition, child had a pending probation violation and an unlawful possession of a weapon charge. Child had failed in a number of detention programs and foster homes, as well as failing in a trial return to his mother's home. The representative from Children's Services Division told the court that they had nothing left to offer child.

constituted rape in the first degree. That is one of a small list of offenses that the legislature has deemed to be so serious that additional identifying information should be on file. The obvious goal of the statute is that child will be more easily identified and apprehended if he ever commits a crime in which he leaves in his wake a sampling of his DNA, which can be found in blood, semen, skin and hair follicles.

By authorizing the extraction of a blood sample, ORS 419C.473(1) authorizes a type of search and seizure by a government agency. *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988). Therefore, it implicates Article I, section 9, of the Oregon Constitution, which protects citizens from "unreasonable" searches and seizures by the government. Thus, I see our first task as one of determining whether, under the Oregon Constitution,[1] a blood draw is unreasonable when required of juveniles who have committed the adult equivalent of murder, a felony sex offense, or burglary with intent to commit a felony sex offense, and who have, as a consequence, come within the jurisdiction of the juvenile court.

I would hold that the challenged statute is clearly reasonable, for a number of reasons. First, it is narrow in scope. It does not require that an individual give more than one DNA blood sample in his or her lifetime, ORS 419C.473(2)(a),[2] it does not require that *any* blood sample be provided if the drawing of that sample would create an unreasonable health risk to the donor, ORS 419C.473(2)(b), and it does not apply to mere suspects or arrestees. The search does not take place unless there is a conviction or its juvenile court equivalent, and its level of invasiveness is "minor." *State v. Heintz*, 286 Or 239, 249, 594 P2d 385 (1979).

Second, the reasons for and consequences of a search and seizure under ORS 419C.473 comport with long-

---

[1] A Virginia statute that allows the government to obtain blood samples from convicted felons for the creation of a DNA database that will be used in future law enforcement purposes has been held not to violate the Fourth Amendment to the United States Constitution. *Jones v. Murray*, 962 F2d 302, 307 (4th Cir), *cert den* 113 US 472 (1992).

[2] ORS 419C.473(2)(a) provides that no blood draw is required if the child has previously provided an adequate blood sample.

accepted, traditional goals of our criminal justice system, namely, to deter future criminal conduct and to apprehend those who violate criminal laws, by allowing compilation of data that will help identify individuals who have left evidence of their identity at the scene of a crime.[3] Although the dissent complains that the blood draw in this case does not comport with the general search and seizure rules that require "individualized suspicion" and a search warrant or an exception to the warrant requirement, those rules were established to address very different circumstances: They decrease the likelihood that an innocent citizen will be subjected to groundless, *i.e.*, unreasonable, searches by the government, in its quest for *evidence* of crime.[4] Those rules have little applicability to juveniles who have been adjudicated to have committed — or, under ORS 137.076, to adults who have been convicted of — a criminal offense.

When a blood draw takes place in the post-adjudication/post-conviction context, the relevant inquiry is no longer whether an officer had probable cause to believe that an individual committed a crime, or whether a warrant could have been timely secured. In this context, the rules requiring individualized suspicion, and the protections that are afforded by those rules, *yield* to concepts such as "penological objectives," which place greater emphasis on the public's interest in maintaining security and rehabilitating criminals. Our focus shifts to whether the governmental action is unreasonable and whether the constraints, if any, that are placed on the adjudicated juvenile or convicted adult are "capricious" or "irrelevant" to the affected individual's status. *State v. Robinson*, 217 Or 612, 616, 343 P2d 886 (1959).[5]

---

[3] The prospective use of DNA patterns serves the same function as the government's collection of fingerprints, photographs and toe prints: It is an aid to identification. As the dissent acknowledges, the accumulation and use of those other identifying characteristics is not unconstitutional.

[4] It is worth noting that, even under the rules on which the dissent would have us rely, an officer may draw blood to determine the level of intoxication of a person who is merely *believed* to be committing the crime of DUII. *State v. Milligan, supra.*

[5] In *Robinson*, the defendant challenged the constitutionality of a statute that permanently bars convicted felons from possessing concealable firearms. The defendant in that case argued, correctly, that the statute amounts to a life-long impairment of his constitutional right to bear arms. Or Const, Art I, § 27. The Oregon Supreme Court upheld the statute. It noted, first, that the legislature "was attempting to prevent crimes of the kind in which concealed weapons play a part," by placing

Given the serious nature of the offenses committed by child and the high rates of recitivism for violent offenders, a statute that allows the police to take and keep a sample of child's blood cannot legitimately be deemed "irrelevant" to child's offense nor "unreasonable" under Article I, section 9. It bears "a reasonable relationship to the reformation of the offender [and] the protection of the public." *State v. Culbertson*, 29 Or App 363, 372, 563 P2d 1224 (1977).

The dissent incorrectly suggests that, although a class-based restriction on convicted felons' constitutional right to bear arms was upheld in *State v. Robinson, supra*, no class-based restriction would be permissible in the arena of search and seizure. Yet the case law regarding penological objectives has allowed precisely such restrictions by upholding class-based searches and seizures that do not rely on individualized suspicion. For example, a convicted felon who is incarcerated may be subjected to a body cavity search if he or she has been in contact with visitors from outside the institution. *Bell v. Wolfish,* 441 US 520, 99 S Ct 1861, 60 L Ed 2d 447 (1979). Prison officials need not suspect that a *particular* prisoner is carrying contraband in a body cavity before they can conduct a search. To advance the valid penological objective of maintaining the security of the institution, prison officials are allowed to search the entire *class* of prisoners who, for example, have had the opportunity to come into physical contact with visitors and have thereby had an opportunity to obtain contraband. Similarly, jail cells can be searched for weapons without officials suspecting that each of the individuals in those cells is in possession of a weapon. *Hudson v. Palmer*, 468 US 517, 104 S Ct 3194, 82 L Ed 2d 393 (1984). Those are but a few examples of how penological

---

constraints on persons "whose past conviction of a felony showed an unsocial attitude." 217 Or at 616. The court continued:

"The legislature evidently believed that ex-convicts who possess [concealable] firearms * * * are more likely to commit evil than if they are forced to remain unarmed. *We can not say that a classification based upon that proposition is capricious or that it is irrelevant to the legislative purpose. * * ** [Even an individual who commits a non-violent felony] displays a lack of proper restraint to which virtually all others yield instinctively. By his own felonious conduct he classifies himself and places himself in a category different from that composed of the law abiding. When the legislature concludes that a person of that kind can not be trusted with a concealable weapon *we surely can not say that its decision lacks reason.*" 217 Or at 616-17. (Emphasis supplied.)

objectives support searches in the post-adjudication/post-conviction context that are not limited by the pre-conviction, individualized suspicion-based rules regarding search and seizure.

Third, although the dissent recognizes that convicted offenders are not entitled to the same constitutional protections as other citizens when there is a valid penological justification for the government's action, *see* 129 Or App at 165, it ignores entirely the fact that deterrence is an integral part of rehabilitation. If a convicted felon is the type of individual who will be deterred from future criminal conduct based on the knowledge that she or he will be apprehended and held responsible for that conduct, there can be little dispute that application of the statute at issue in this case will be a considerable deterrent for such an individual. Whereas one may successfully avoid leaving a fingerprint at the scene of a crime, it would be considerably harder to avoid unintentionally leaving behind a flake of skin or a follicle of hair while committing a violent crime. If a convicted felon knows that those "leavings" will reveal his or her identity and is therefore deterred from committing a crime, the rehabilitative process has begun. Rehabilitation does not require that one never *considers* committing another crime; it requires that one never *act* on such thoughts. In sum, I would hold that ORS 419C.473 is justified by penological considerations.

In its final paragraph, the dissent expresses concerns about "infants in maternity wards" being subjected to involuntary blood extractions. 129 Or App at 166. Let's get real. This case is not about law-abiding citizens. It is not about infants singing too loud in the nursery, or toddlers who have taken their buddies' tricycles without permission. This case is about big boys who are committing *serious* and often brutal crimes against other people—crimes such as rape, sodomy and murder. This case is about a statute that may help convey a message to a small group of juveniles who have been found to have committed one or more of a very limited number of very serious acts which, if committed by an adult, would constitute a very serious crime. If the juvenile justice system is ever to succeed, it must send a message—consistent, loud and clear—to the youthful offenders in this state who are

bent on committing serious crimes, that one of the consequences for their misdeeds is that they will be more readily identified, if they commit other misdeeds in the future. If the system can teach these juveniles that there are consequences to their actions, that they will be held accountable, it will have served both them and society well.

Fourth, I believe very strongly that an analysis of the constitutionality, *i.e.*, the reasonableness, of the blood draw authorized by ORS 419C.473, also must give due consideration to the *protection of the public*, which has always been —and should forever continue to be—one of the vital concerns of our criminal justice system. Although the dissent criticizes such considerations as an impermissible "balancing" of public and private rights, the fact of the matter is that convicted criminals and juvenile delinquents have, by their very actions, already impaired their constitutional rights to, *inter alia*, liberty, privacy and freedom of association. As a consequence of his acts and the juvenile court's having assumed jurisdiction over him, child in this case has privacy interests that are dramatically lower than those enjoyed by children in general.[6] Losing the "right" to keep one's DNA pattern private is an acceptable loss of privacy incident to the commission of specific, serious crimes. I would hold—unequivocally—that the statute at issue does not violate any privacy interest that rationally can be maintained by an individual who is judicially found to have committed first degree rape.

Although, for the reasons discussed above, I would conclude that ORS 419C.473 authorizes a "reasonable" search and seizure, I believe that a complete analysis of the statute's constitutionality must include an additional step. The statute provides that, upon a finding of jurisdiction over a child who has committed one of the listed offenses,

> "the court shall order the child to submit to the drawing of a blood sample in the manner provided by ORS 137.076. The court shall further order that as soon as practicable after the

---

[6] As we said in *State v. Brotherton*, 2 Or App 157, 160, 465 P2d 749 (1970),

"It has long been the rule that '[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Price v. Johnson*, 334 US 266, 285, 68 S Ct 1049, 92 L Ed 1356 (1948)."

entry of the dispositional order, the law enforcement agency attending upon the court shall cause a blood sample to be drawn and transmitted in accordance with ORS 137.076. The court may also order the child to reimburse the appropriate agency for the cost of drawing and transmitting the blood sample." ORS 419C.473(1).

For adult offenders, the court is directed to "include in the judgment of conviction an order stating that a blood sample is required to be drawn[.]" ORS 137.076(2)(b). Given the timing and the mandatory nature of the blood draw, and the fact that it is a governmental action that flows directly from the judgment of conviction, I believe that the blood draw should be viewed as one aspect of a juvenile's disposition, or as one component of an adult offender's sentence. As such, it must comport with the constitutional protections relating to sentencing, which I would summarize as follows: Criminal offenders may not be subjected to cruel and unusual punishment, Or Const, Art I, § 16; may not be treated "with unnecessary rigor," Or Const, Art I, § 13; and may not be punished under laws that are founded on vindictive justice, Or Const, Art I, § 15. The taking of a blood sample to establish a DNA databank does not violate any of those constitutional protections.

For all of these reasons, I concur in the majority's holding that the trial court did not err in requiring child to submit to a blood test pursuant to ORS 419C.473.

Edmonds and De Muniz, JJ., join in this concurrence.

**HASELTON, J.,** dissenting.

Facilitating future criminal investigations is a laudable legislative goal. But that goal cannot constitutionally be achieved through dragnet, warrantless searches and seizures of criminal offenders' blood. Accordingly, I dissent from the majority's opinion affirming the trial court's order requiring child to provide a blood sample for DNA testing pursuant to *former* ORS 419.507(11)(a) (*repealed by* Or Laws 1993, ch 33, § 373).[1]

---

[1] ORS 419C.473 (Or Laws 1993, ch 33, § 237) replaces *former* ORS 419.507(11) and is substantively the same.

ORS 137.076 and *former* ORS 419.507(11) require the court to order all convicted murderers, felony sex offenders, and juveniles found within the jurisdiction of the court for committing similar offenses[2] to submit to the extraction of a blood sample for DNA analysis for the purpose of maintaining a criminal identification database. Those records are to be made available to law enforcement agencies, district attorneys, and the Criminal Justice Division of the Department of Justice "for the purpose of establishing the identity of a person in the course of a criminal investigation or proceeding." ORS 181.085(2)(a). The information is also available to courts, grand juries, and other parties in a criminal prosecution or juvenile proceeding under certain circumstances. ORS 181.085(2)(b); ORS 181.085(2)(c).

Extraction of blood, as the majority acknowledges, implicates Article I, section 9, of the Oregon Constitution. 129 Or App at 151. *See State v. Milligan*, 304 Or 659, 748 P2d 130 (1988).[3] However, the majority reasons that, because persons convicted or adjudicated of certain offenses have a lessened expectation of privacy, the statutorily prescribed warrantless blood extraction cannot be deemed an "unreasonable search or seizure" within the meaning of Article I, section 9.[4]

The majority's conclusion depends on two premises. First, the extraction of blood is similar to the routine fingerprinting of suspects or offenders in custody. Second, even in

---

[2] Juvenile offenders found to have committed acts which, if committed by an adult, would constitute crimes are properly referred to as "within the jurisdiction of the juvenile court." *See* ORS 419C.005(1); *State ex rel Juv. Dept. v. Cruz*, 111 Or App 216, 219, 826 P2d 30 (1992). Juveniles are neither "convicted" nor found "guilty." ORS 419C.400(4). Because I conclude that ORS 137.076, which refers to adults convicted of specified offenses, is not constitutional, I need not directly address the parallel juvenile statute, requiring blood draws from juveniles found within the jurisdiction of the court for felonies listed in ORS 137.076(1).

[3] Because I would base my reversal on state constitutional grounds, there is no need to reach child's Fourth Amendment arguments. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981); *but cf. Jones v. Murray*, 962 F2d 302 (4th Cir), *cert den* 113 S Ct 472, ___ US ___ (1992) (Virginia statute requiring all convicted felons to submit blood samples for DNA analysis for future law enforcement purposes is valid under Fourth Amendment); *State v. Olivas*, 122 Wash 2d 73, 856 P2d 1076 (1993) (rejecting Fourth Amendment-based challenge to Washington statute requiring blood samples for DNA analysis of certain convicted offenders).

[4] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

the absence of any penological objective, criminal offenders have reduced constitutional rights.

The majority's fingerprinting premise fails because we, and our Supreme Court, have treated fingerprinting and blood extraction as being constitutionally different. In *State v. Cullop*, 19 Or App 129, 526 P2d 1048, *rev den* (1974), this court held that police officers were not required to obtain a search warrant before fingerprinting a criminal suspect who was legally in custody. This was so even where the finger-printing occurred not as part of a routine "booking" process, but at the time of trial to obtain evidence of defendant's presence at the crime scene. 19 Or App at 132, *citing with approval United States v. Dionisio*, 410 US 1, 93 S Ct 764, 35 L Ed 2d 67 (1973) (compelled voice exemplar was not Fourth Amendment "seizure").[5]

Conversely, in *State v. Milligan, supra,* the court held that exigent circumstances, *e.g.*, the dissipation of a suspect's blood alcohol level "with every breath he took," permitted the warrantless and unconsented extraction of blood from a DUII suspect. 304 Or at 665-67. *Milligan* presumes that, absent some established exception to the warrant requirement, a warrant must be obtained to draw blood; otherwise, the *Milligan* court would not have been obliged to engage in its "exigent circumstances" analysis. *See also State v. Heintz*, 286 Or 239, 594 P2d 385 (1979).

This distinction between fingerprinting and blood extraction is constitutionally sound. As we implicitly recognized by our reference to *United States v. Dionisio, supra,* in *State v. Cullop, supra,* fingerprinting, like voice exemplars, involves personal features or attributes that are not hidden but are, instead, exposed to the public at large. There is no privacy right in such features or attributes:

> "The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial

---

[5] *State v. Cullop, supra*, was decided under a Fourth Amendment analysis, and no subsequent decision has addressed the application of Article I, section 9, to fingerprinting. *Accord State v. Flores*, 68 Or App 617, 685 P2d 999, *rev den* 298 Or 151 (1984) (addressing uncertain precedential value under Article I, section 9, of Oregon decisions applying Fourth Amendment analysis).

characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world. * * *

"The required disclosure of a person's voice is thus immeasurably further removed from the Fourth Amendment protection than was the intrusion into the body effected by the blood extraction in [*Schmerber v. California*, 384 US 757, 86 S Ct 1826, 16 L Ed 2d 908 (1966)]. * * * Rather, this is like the fingerprinting in [*Davis v. Mississippi*]." 410 US at 14-15.

*Cf. Davis v. Mississippi*, 394 US 721, 727, 89 S Ct 1394, 22 L Ed 2d 676 (1969) (applying Fourth Amendment analysis: dragnet detentions, which included fingerprinting, were unconstitutional seizures; however, fingerprinting itself "involves none of the probing into an individual's private life and thoughts that marks an interrogation or search").[6]

Blood extraction is different. By its very nature, blood extraction involves the puncturing of skin and the drawing out of bodily fluids that would otherwise be hidden from public scrutiny.

Consistent with *Milligan*, if police officers wish to obtain a blood sample from a murder suspect to compare the suspect's blood with that found at the crime scene, they must first obtain a warrant based on "individualized suspicion" that the suspect was, in fact, involved in the murder. *See State v. Boyanovsky*, 304 Or 131, 134, 743 P2d 711 (1987); *State v. Woodward*, 107 Or App 123, 126, 810 P2d 1330 (1991).[7]

Here, child is, *at worst*, constitutionally indistinguishable from the hypothetical murder suspect. There are no exigent circumstances or other established exceptions to the warrant requirement that would permit the extraction

---

[6] For the same reasons, suspects who are legally in custody can be compelled to participate in line-ups, and their mug shots can be taken without a warrant.

[7] In such circumstances, the critical exigencies in *Milligan* — e.g., the potential for dissipation for blood alcohol levels, would not be present. *Accord Cupp v. Murphy*, 412 US 291, 296, 93 S Ct 2000, 36 L Ed 2d 900 (1973) (sustaining warrantless procurement of scrapings from murder suspect's fingernails because of "ready destructibility of the evidence").

of child's blood without a warrant. Indeed, unlike the hypothetical murder suspect from whom blood might be drawn upon the issuance of a warrant based on individualized suspicion of wrongdoing, there could never be such individualized suspicion justifying the drawing of blood as potential evidence for future, yet-to-be (and, perhaps, never-to-be) committed crimes. Prospective individualized suspicion is a contradiction in constitutional terms.

Because the fingerprinting premise is inapt, the majority's defense of the blood extraction statutes rests, ultimately, on the second premise, that even in the absence of special penological objectives,[8] the protections of Article I, section 9, do not apply to adjudicated or convicted offenders. In particular, the majority creates a "narrow class" of constitutionally permissible "searches and seizures of prisoners that are performed without probable cause and without a penological objective." 129 Or App at 152. The majority proffers no precedent for this proposition and identifies no other members of this "narrow class." This is, apparently, a class of one.

The concurring opinion attempts to fill the breech by invoking *State v. Robinson*, 217 Or 612, 343 P2d 886 (1959), where the court upheld a statute permanently barring convicted felons from possessing concealable firearms. The court sustained the statute against, *inter alia*, a challenge that it violated the Oregon Constitution, Article I, section 27, pertaining to the right to bear arms:

> "According to page 469 of A History of the Oregon Constitution (Carey), Art I, § 27, was patterned upon and is identical to Art I, §§ 32 and 33, Constitution of Indiana. *McIntyre v. State*, 170 Ind 163, 83 NE 1005 [1908], held that the Indiana provision (§ 32) permits reasonable regulation of the right to bear arms and that accordingly legislation prohibiting the carrying of concealed weapons is valid." *State v. Robinson, supra*, 217 Or at 619.

Because Article I, section 27, imports a notion of "reasonable regulation," the legislature may impose generic, *class*-based restrictions on the right to bear arms. *See* ORS

---

[8] The majority concedes that there is no valid penological objective justifying the search in this case. 129 Or App at 151.

166.250(1)(c) (prohibiting possession of firearms by, *inter alia*, persons under 18 years of age, persons convicted of felonies, and persons civilly committed under ORS 426.130). Such restrictions are constitutional as an exercise of the state's police power so long as they are based on a reasonable legislative prediction that, "in the generality of cases," members of the affected class are "more likely than others to resort to force and violence and would be a greater threat to the public safety when in possession of a concealable firearm than when not." *State v. Cartwright*, 246 Or 120, 135, 418 P2d 822 (1966), *cert den* 386 US 937 (1967). *Accord State v. Kessler*, 289 Or 359, 363-70, 614 P2d 94 (1980) (examining historical context of Article I, section 27).

Unlike Article I, section 27, the protections of Article I, section 9, are not circumscribed by the general police power. Such protections do not depend on actuarial predictions, however "rational," that members of a targeted class are generally more likely to engage in future criminal conduct than other citizens. Article I, section 9, requires individualized, not generic, suspicion. *State v. Boyanovsky, supra*, 304 Or at 134.[9]

Absent a showing of penological justification, convicted offenders are entitled to the same protections under Article I, section 9, as other citizens.[10] The proffered justification of facilitating future criminal prosecutions is not enough. The same rationale would justify subjecting every

[9] I acknowledge, and appreciate, the concurring opinion's observation that the conduct triggering statutory blood draws is "very serious." 129 Or App at 158. (Rossman, J., concurring.) This is hardly child's play. But the egregiousness of that conduct cannot transform our inquiry under Article I, section 9, into a sort of balancing test, weighing the degree of intrusiveness against the *"protection of the public."* 129 Or App at 159. (Emphasis in original.) For better or worse, under Article I, section 9, warrantless searches are subject to certain, well-recognized exceptions, *per se* unreasonable. *See State v. Weaver*, 319 Or 212, 874 P2d 1322 (1994); *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985).

[10] Valid penological objectives include rehabilitation of persons on probation or parole. Consequently, conditions of probation and parole pertaining to testing of breath or urine for controlled substances or alcohol use are permissible so long as such conditions are reasonably calculated to promote a particular offender's rehabilitation. *State v. Fisher*, 32 Or App 465, 469, 574 P2d 354, *rev den* 283 Or 99 (1978); *State v. Culbertson*, 29 Or App 363, 563 P2d 1224 (1977). *Accord* ORS 137.540(1)(c) (authorizing breath and urine testing as condition of probation where "probationer has a history of substance abuse or if there is a reasonable suspicion that the probationer has illegally used controlled substances").

citizen of Oregon—from judges of this court to infants in maternity wards—to involuntary blood extractions because he or she *might* commit a crime in the future and the blood DNA analysis *might* facilitate investigation and conviction. Article I, section 9, does not countenance such an Orwellian result.

I respectfully dissent.

Leeson, J., joins in this dissent.