Argued and submitted March 4, affirmed in part,
reversed in part July 15, 1980

## STATE OF OREGON,
*Respondent,*

*v.*

## RANDY KESSLER,
*Petitioner.*

(TC DA 160004-7811, CA 14296, SC 26705)

614 P2d 94

David L. Slader, Portland, argued the cause and filed the brief for petitioner.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Denecke, Chief Justice, and Tongue, Howell, Lent and Peterson, Justices.

LENT, J.

## LENT, J.

The defendant in this case was convicted of "possession of a slugging weapon," ORS 166.510(1).[1] We allowed review to consider his claim that the legislative prohibition of the possession of a "billy"[2] in ORS 166.510(1) violates Article I, section 27, of the Oregon Constitution. That provision states:

"The people shall have the right to bear arms for the defence [sic] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power."

The language of this provision raises several questions in this case, including:

(a) To whom does the right belong?

(b) What is the meaning of "defense of themselves"?

(c) What is the meaning of "arms," and what, if any, weapons of current usage are included in this term?

The scope of Article I, section 27, has not previously been analyzed by Oregon courts.[3] The decisions construing the second amendment to the United

---

[1] ORS 166.510(1) provides:

"(1) Except as provided in ORS 166.515 or 166.520, any person who manufactures, causes to be manufactured, sells, keeps for sale, offers, gives, loans, carries or possesses an instrument or weapon having a blade which projects or swings into position by force of a spring or other device and commonly known as a switch-blade knife or an instrument or weapon commonly known as a blackjack, slung shot, billy, sandclub, sandbag, sap glove or metal knuckles or who carries a dirk, dagger or stiletto commits a Class A misdemeanor."

Although the words "slugging weapon" are not used in ORS 166.510, this term was used in the complaint filed in this case.

[2] Webster's Third International Dictionary defines a "billy" as "a heavy usually wooden weapon for delivering blows; club, especially a policeman's club."

[3] In *State v. Robinson,* 217 Or 612, 619, 343 P2d 886 (1959) this court held that ORS 166.270 which prohibits ex-convicts from possessing concealed weapons did not violate Article I, section 27, of the Oregon Constitution. Accord, *State v. Cartwright,* 246 Or 120, 134-137, 418 P2d 822 (1967).

States Constitution are not particularly helpful because the wording of the second amendment differs substantially from our state provision. The second amendment has not yet been held to apply to state limitations on the bearing of arms.[4] The wording of Oregon's right to bear arms provision also differs from many other state constitutional provisions.[5]

Despite the many variations in wording, the states' constitutional provisions guaranteeing the right to bear arms share a common historical background. We begin first with an examination of this historical background and then with an examination of the meaning and purpose of the particular words chosen by the Oregon drafters. We are not unmindful that there is current controversy over the wisdom of a right to bear arms, and that the original motivations for such a provision might not seem compelling if debated as a new issue. Our task, however, in construing a constitutional provision is to respect the principles given the status of constitutional guarantees and limitations by the drafters; it is not to abandon these principles when this fits the needs of the moment.

---

[4] The second amendment to the United States Constitution provides:

"A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

In early cases the United States Supreme Court held that the second amendment proscription applies only to Congress. *Presser v. Illinois,* 116 US 252, 6 S Ct 580, 29 L Ed 615 (1886); *United States v. Cruikshank,* 92 US 542, 23 L Ed 588 (1876). The second amendment has not yet been held applicable to the states, either directly or through selective incorporation in the fourteenth amendment. *See* Rohner, *The Right to Bear Arms: A Phenomenon of Constitutional History,* 16 Catholic U L Rev 53 (1966).

[5] For a helpful catagorization of various state constitutional right to bear arms provisions see Note, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation,* 38 U Chi L Rev 185 (1970).

## I. *The historical background*

The first article of Oregon's constitution of 1859 contains the state's bill of rights. Article I, section 27, regarding the right to bear arms was taken verbatim from sections 32 and 33 of the Indiana Constitution of 1851. C. Carey, *A History of the Oregon Constitution* 469 (1926); Palmer, *The Sources of the Oregon Constitution,* 5 Or L Rev 200, 202 (1926).

The original Indiana constitution was adopted in 1816 at Indiana's first statehood convention. Indiana's constitution was revised in 1851, but the 1816 version of the right to bear arms provision remained unchanged. *See* W. Swindler, *Sources and Documents of U.S. Constitutions,* vol 3, p 345-400 (1974).

The drafters of Indiana's bill of rights of 1816 borrowed freely from the wording of other state constitutions, most notably the constitutions of Kentucky, Ohio, Tennessee, and Pennsylvania. Twomley, *The Indiana Bill of Rights,* 20 Ind L J 211, 212-213 (1945). These state constitutions were drafted between 1776 and 1802. Oregon's right to bear arms provision therefore can be traced to state provisions drafted in the revolutionary and post-revolutionary war era.

The constitutions adopted by the original colonies generally included a bill or declaration of rights. Many of the declarations of rights were patterned largely upon the English Bill of Rights of 1689.[6] The background of the English Bill of Rights sheds some light upon the meaning of the right to bear arms provisions in the colonial constitutions.

James II, a Catholic king, ascended the English throne in 1685 amidst domestic religious controversy between the Catholics and Protestants. James II established a strong standing army which he

---

[6] *See generally,* B. Schwartz, *The Great Rights of Mankind* 1-36 (1977); Feller and Gotting, *The Second Amendment: A Second Look,* 61 Northwestern U L Rev 46, 47-56 (1966).

quartered in private homes. He sought to repeal certain laws of Parliament which barred Catholics from public offices. The Protestants revolted in the "Glorious Revolution" of 1688 and succeeded in deposing James II and bringing to power the king's Protestant daughter, Mary, and her husband, William of Orange. William and Mary were offered the crown in 1689 on condition that they sign the Declaration of Rights. The Declaration was later enacted as a statute, which was divided into two parts, first listing the allegedly illegal actions of James II, then declaring the rights of the people. The first part stated that James II:

> "* * * did endeavor to subvert and extirpate the Protestant Religion and the Laws and Liberties of this Kingdom * * *.

> "5.  By raising and keeping a Standing army within this Kingdom in Time of Peace without Consent of Parliament and quartering Soldiers contrary to Law.

> "6.  By causing several good Subjects, being Protestants, to be disarmed at the same Time when Papists were both armed and employed contrary to Law."

The parallel provisions of the declaration of rights provided:

> "* * * 5. That the raising or keeping a Standing Army within the Kingdom unless it be with the Consent of Parliament is against Law.

> "6. That the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions, and as allowed by Law."[7]

Historians have noted that the early colonial legislatures perceived themselves as descendants of the House of Commons who shared many of the same political experiences of their 17th century English counterparts. See B. Schwartz, *The Great Rights of Mankind* 15, 31-32 (1977). The French and Indian War ending in 1763 brought large numbers of British

---

[7] Bill of Rights, 1 W. & M., sess. 2, c. 2 (1689), *reprinted in* Weatherup, *Standing Armies and Armed Citizens:  An Historical Analysis of the Second Amendment,* 2 Hastings Const L Q 961, 973 (1975).

soldiers to the colonies. King George III maintained and increased these standing armies following that war, and ordered the troops to be quartered in private homes. The colonists who were accustomed to relying on their own citizen militias viewed the standing armies as an unlawful instrument of oppression. *See* Weatherup, *Standing Armies and Armed Citizens; An Historical Analysis of the Second Amendment,* 2 Hastings Const L Q 961, 975-978 (1975). The state constitutions drafted in the revolutionary war era therefore included provisions guaranteeing the right to bear arms and prohibiting standing armies in time of peace. The relevant provisions of the English Bill of Rights of 1689 provided a useful model for the colonial drafters.

## II. *The Oregon right to bear arms*
### A. *"Defense of themselves and the state"*

We have noted that Oregon's constitutional right to bear arms provision, Or Const. Art I, § 27, was taken verbatim from the Indiana constitutional provision drafted in 1816. The phrase "for defense of themselves and the state" in Indiana's provision was most likely taken from the Kentucky provision in its 1799 constitution, or the Ohio provision in its 1802 constitution.[8] The phrase "for defense of themselves and the

---

[8] Art X, §§ 23 and 24, of the 1799 Kentucky constitution provided:

"Sec. 23. That the rights of the citizens to bear arms in defence of themselves and the State shall not be questioned.

"Sec. 24. That no standing army shall, in time of peace, be kept up, without the consent of the legislature; and the military shall, in all cases and at all times, be in strict subordination to the civil power."

W. Swindler, *Sources and Documents of U. S. Constitutions,* Vol 4, p 163 (1975).

Art VIII, § 20, of the 1802 Ohio constitution provided:

"Sec. 20. That the people have a right to bear arms for the defence of themselves and the State; and as standing armies, in time of peace, are dangerous to liberty, they shall not be kept up, and that the military shall be kept under strict subordination to the civil power."

W. Swindler, *Sources and Documents of U. S. Constitutions,* Vol 7, p 555 (1978). Ohio's constitutional provision was most likely taken from Art XIII of Pennsylvania's constitutional Bill of Rights of 1776 which provided:

state" appears in the present day constitutions of Oregon, Indiana, and six other states.[9] The language is subject to varying interpretations. It has been suggested that the language includes three separate justifications for a state constitutional right to bear arms: (a) The preference for a militia over a standing army; (b) the deterrence of governmental oppression; and (c) the right of personal defense.[10]

The language "the right to bear arms * * * for defense of * * * the state" most likely refers to the historical preference for a citizen militia rather than a standing army as outlined above.[11] *See People v. Brown,* 253 Mich 537, 235 NW 245, 246 (1931):

> "It is generally recognized that * * * the right to bear arms had its origin in the fear of the American colonists of a standing army and its use to oppress the people, and in their attachment to a militia composed of all able-bodied men. Probably the necessity of self protection in a frontier society also was a factor."

The phrase "the right to bear arms in defense of themselves" has a suggested purpose which is

---

"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."

W. Swindler, *Sources and Documents of U. S. Constitutions,* Vol 8, p 279 (1979).

[9] The phrase "for defense of themselves and the state" appears in the constitutions of Florida, Declaration of Rights § 20; Kentucky Bill of Rights § 1; Pennsylvania, art I, § 21; South Dakota, art VI, § 24; Vermont, ch 1, art 16; and Wyoming, art I, § 24.

[10] *See* Note, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation,* 38 U Chi L Rev 185, 190-198 (1970).

[11] Despite the early Americans' objection to standing armies and their preference for citizen militias, our society today apparently prefers the maintenance of federally controlled standing armies. The federal government has assumed total responsibility for training and supplying the "state militias," i.e., the National Guard. *See, e.g.,* 32 USC, §§ 101, 102, 501, 502, 701 (1976); Rohner, *The Right to Bear Arms: A Phenomenon of Constitutional History,* 16 Cath U L Rev 53, 72 (1966).

closely related to the preference for citizen militias. That suggested purpose is the deterrence of government from oppressing unarmed segments of the population. For example, King James II attempted to disarm the Protestants while allowing Catholics to bear arms, thus prompting the guarantee in the 1689 Bill of Rights that Protestants could have "arms for their defense."[12] Joseph Story wrote that,

> "The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them."

J. Story, *Commentaries on the Constitution,* Vol 3, p 746 (1833). *Cf, Carlton v. State,* 63 Fla 1, 58 So 486, 488 (1912) (state provision was "intended to give the people the means of protecting themselves against oppression and public outrage").

"Defense of themselves" has also been said to include an individual's right to bear arms to protect his person and home. *Schubert v. DeBard,* ____ Ind App ____, 398 NE2d 1339, 1341 (1980) (Indiana constitution provides citizenry the right to bear arms for their personal self-defense). Self-defense has been recognized as a privilege in both civil and criminal law since about 1400 in England and at all times in the United States.[13] Although the right to bear arms for self protection does not appear to have been an impor-

---

[12] *See* text accompanying note 7 *supra.*

[13]

"The privilege of self-defense rests upon the necessity of permitting a man who is attacked to take reasonable steps to prevent harm to himself, where there is no time to resort to the law. The early English law, with its views of strict liability, did not recognize such a privilege; * * *. But since about 1400 the privilege has been recognized, and it is now undisputed, in the law of torts as well as in the criminal law." (citations omitted) W. Prosser, *Law of Torts* 108 (4th ed 1971).

tant development in England, the justification for a right to bear arms in defense of person and home probably reflects the exigencies of the rural American experience. *See People v. Brown, supra. Cf., Matthews v. State,* 237 Ind 677, 689-692, 148 NE2d 334, 339-341 (1958) (Emmert, C. J., dissenting) (constitutional guarantee based on historical necessity for personal defense.)[14]

## B. *The meaning of the term "arms"*

The term "arms" is also subject to several interpretations. In the colonial and revolutionary war era, weapons used by militiamen and weapons used in defense of person and home were one and the same. A colonist usually had only one gun which was used for hunting, protection, and militia duty, plus a hatchet, sword, and knife. G. Neumann, *Swords and Blades of the American Revolution,* 6-15, 252-254 (1973). When the revolutionary war began, the colonists came equipped with their hunting muskets or rifles, hatchets, swords, and knives. The colonists suffered a severe shortage of firearms in the early years of the war, so many soldiers had to rely primarily on swords, hatchets, knives, and pikes (long staffs with a spear head). W. Moore, *Weapons of the American Revolution,* 8 (1967).

Therefore, the term "arms" as used by the drafters of the constitutions probably was intended to include those weapons used by settlers for both personal and military defense. The term "arms" was not limited to firearms, but included several handcarried weapons commonly used for defense. The term "arms" would not have included cannon or other heavy ordnance not kept by militiamen or private citizens.

---

[14] *Compare* the provisions in several state constitutions which guarantee that a person has the right to bear arms "in defense of his home, person and property." Colo Const, Art II, § 13; Miss Const, Art III, § 12; Mo Const, Art I, § 23; Mont Const, Art III, § 13; Okla Const, Art II, § 26; *State v. Nickerson,* 126 Mont 157, 247 P2d 188 (1952) (defendant cannot be convicted of assault if he pointed a loaded gun at a trespasser in his home); *accord, State v. Plassard,* 355 Mo 90, 195 SW2d 495 (1946).

The revolutionary war era ended at a time when the rapid social and economic changes of the so-called Industrial Revolution began. The technology of weapons and warfare entered an unprecedented era of change. P. Cleator, *Weapons of War* 143-152 (1967). Firearms and other hand-carried weapons remained the weapons of personal defense, but the arrival of steam power, mechanization, and chemical discoveries completely changed the weapons of military warfare. The development of powerful explosives in the mid-nineteenth century, combined with the development of mass-produced metal parts, made possible the automatic weapons, explosives, and chemicals of modern warfare. P. Cleator, *Weapons of War* 153-177 (1967).

■　　˙These advanced weapons of modern warfare have never been intended for personal possession and protection. When the constitutional drafters referred to an individual's "right to bear arms," the arms used by the militia and for personal protection were basically the same weapons. Modern weapons used exclusively by the military are not "arms" which are commonly possessed by individuals for defense, therefore, the term "arms" in the constitution does not include such weapons.

■　　If the text and purpose of the constitutional guarantee relied exclusively on the preference for a militia "for defense of the State," then the term "arms" most likely would include only the modern day equivalents of the weapons used by colonial militiamen. The Oregon provision, however, guarantees a right to bear arms "for defense of *themselves,* and the State." (emphasis added.) The term "arms" in our constitution therefore would include weapons commonly used for either purpose, even if a particular weapon is unlikely to be used as a militia weapon.

■　　The constitutional guarantee that persons have the right to "bear arms" does not mean that all individuals have an unrestricted right to carry or use personal weapons in all circumstances. For example,

the danger of firearms was recognized shortly after the development of gunpowder. The English Statute of Northampton in 1327 forbade persons to ride at night carrying a firearm for the purpose of terrifying the people.[15] A 1678 Massachusetts law forbade shooting near any house, barn, garden, or highway in any town where a person may be "killed, wounded, or otherwise damaged."[16] The courts of many states have upheld statutes which restrict the possession or manner of carrying personal weapons. The reasoning of the courts is generally that a regulation is valid if the aim of public safety does not frustrate the guarantees of the state constitution. For example, many courts have upheld statutes prohibiting the carrying of concealed weapons, *see, e.g., State v. Hart,* 66 Idaho 217, 157 P2d 72 (1945); and statutes prohibiting possession of firearms by felons, *see, e.g., State v. Cartwright,* 246 Or 120, 418 P2d 822 (1966).

## III. *The present case*

We now turn to the facts of the present case. The defendant was involved in an off and on verbal argument with his apartment manager in the course of the day on November 13, 1978. The dispute escalated into name calling, colorful words, and object throwing. At one point the defendant kicked the elevator door in the apartment building. The police were called and arrested the defendant. The defendant asked the police to get his coat from his apartment. The officers found two "billy clubs" in the defendant's apartment.

The defendant was charged with disorderly conduct, ORS 166.025, and possession of a slugging weapon, ORS 166.510. The matter went to trial with-

---

[15] 2 Edward III, ch 3 (1328), reprinted in J. Bishop, Statutory Crimes, § 783 (3d ed 1901).

[16] Council held in Boston, March 28, 1678; referred to in Levin, *The Right to Bear Arms: The Development of the American Experience,* 48 Chi-Kent L Rev 148, 150, n 18 (1971).

out a jury. The defendant at trial demurred to and moved to dismiss the second charge on the grounds that it failed to state a crime. The motion was denied and the defendant was found guilty as charged on both counts.

■■ The defendant appealed to the Court of Appeals, contending first that his acts did not amount to the crime of disorderly conduct, and second that the statute prohibiting possession of billy clubs, ORS 166.510(1), violates Article I, section 27, of the Oregon Constitution. The Court of Appeals did not consider defendant's first contention because it was not raised at trial.[17] The Court of Appeals held that ORS 166.510(1) was within the reasonable exercise of the "police power" of the state to curb crime. 43 Or App 303, 307, 602 P2d 1096 (1979).

■ The defendant contends that his conviction for possession of a billy club violates his right to possess arms in his home for personal defense. Pursuant to our previous discussion regarding the purpose and scope of the right to bear arms provision, we hold that Article I, section 27, of the Oregon Constitution includes a right to possess certain arms for defense of person and property. The remaining question is whether the defendant's possession of a billy club in this case is protected by Article I, section 27.

The club is considered the first personal weapon fashioned by humans. O. Hogg, *Clubs to Cannon* 19 (1968). The club is still used today as a personal

---

[17] The general rule in both civil and criminal cases is that a question not raised and preserved in the trial court will not be considered on appeal. *State v. Abel,* 241 Or 465, 467, 406 P2d 902 (1965). Failure to raise an objection in trial court does not automatically preclude appellate review. The defendant's contention that his acts did not constitute the crime of disorderly conduct, however, does not present the exceptional circumstance or manifest error which justifies this court's consideration of such a claim. It follows that defendant's conviction of disorderly conduct is affirmed. Note that this case is not concerned with that aspect of the statute prohibiting disorderly conduct which we held to be unconstitutional in *State v. Spencer,* 289 Or 225, 611 P2d 1147 (1980).

weapon, commonly carried by the police. ORS 166.510 prohibits possession of a "billy;" however, ORS 166.520 states that peace officers are not prohibited from carrying or possessing a weapon commonly known as a "blackjack"[18] or "billy."

The statute in this case, ORS 166.510, prohibits the mere possession of a club. The defendant concedes that the legislature could prohibit carrying a club in a public place in a concealed manner, but the defendant maintains that the legislature cannot prohibit all persons from possessing a club in the home. The defendant argued that a person may prefer to keep in his home a billy club rather than a firearm to defend against intruders.

Our historical analysis of Article I, section 27, indicates that the drafters intended "arms" to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon which cannot logically be excluded from this term. We hold that the defendant's possession of a billy club in his home is protected by Article I, section 27, of the Oregon Constitution.

The defendant's conviction for disorderly conduct is affirmed, and his conviction for possession of a slugging weapon is reversed.

---

[18] Webster's Third International Dictionary defines a "blackjack" as "* * * 4. a small striking weapon typically consisting at the striking end of a leather enclosed piece of lead or other heavy metal and at the handle end of a strap or springy shaft that increases the force of impact."