Argued and submitted May 31, affirmed October 31, 2001

## STATE OF OREGON,
*Respondent,*

*v.*

## MARK LEE HIRSCH,
*Appellant.*

99CR2684FE; A109091

34 P3d 1209

Susan F. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Brewer, Judge.

* Deits, C. J., *vice* Ceniceros, S. J.

LANDAU, P. J.

**LANDAU, P. J.**

Defendant appeals a judgment of conviction for felon in possession of a firearm. ORS 166.270(1). He assigns error to the overruling of his demurrer to the indictment, arguing that ORS 166.270(1) violates his right to bear arms guaranteed by Article I, section 27, of the Oregon Constitution. We affirm.

While on probation for a prior felony conviction, defendant brought a rifle into a gun shop to have it bore-sighted. He was arrested and charged by indictment with felon in possession of a firearm. At trial, he demurred to the indictment on the ground that the statute that was the basis for the charge was unconstitutional. The trial court overruled the demurrer and, after a bench trial, found him guilty.

On appeal, defendant argues that the trial court erred in overruling his demurrer. According to defendant, the statutory prohibition against a felon so much as possessing a firearm conflicts with the constitutional right to bear arms. The state argues that, in the exercise of its police power, it has the right to enact reasonable restrictions on the right to bear arms. In this case, it argues, ORS 166.270(1) amounts to a reasonable restriction because it applies only to felons and only to weapons that are recognized as extremely dangerous.

■ We review the trial court's ruling on the constitutionality of ORS 166.270(1) for errors of law. *State v. Charlesworth/Parks,* 151 Or App 100, 104, 951 P2d 153 (1997), *rev den* 327 Or 82 (1998).

ORS 166.270(1) provides:

"Any person who has been convicted of a felony under the law of this state or any other state, or who has been convicted of a felony under the laws of the Government of the United States, who owns or has in the person's possession or under the person's custody or control any firearm, commits the crime of felon in possession of a firearm."

The question in this case is whether that statute runs afoul of Article I, section 27, of the Oregon Constitution, which provides, in part, that "[t]he people shall have the right to bear arms for the defen[s]e * * * of themselves, and the State."

The Oregon Supreme Court has never articulated the scope of the state's authority to regulate the possession or use of arms. In *State v. Robinson*, 217 Or 612, 343 P2d 886 (1959), the court upheld the constitutionality of a statute that prohibited felons from possessing *concealed* weapons. The court offered little in the way of analysis; it simply noted that the legislature apparently concluded that felons could not be trusted with concealed weapons and that "we surely can not say that its decision lacks reason." *Id.* at 617. Similarly, in *State v. Cartwright*, 246 Or 120, 418 P2d 822 (1966), *cert den* 386 US 937 (1967), the court upheld the constitutionality of a statute that prohibited felons from possessing a pistol. Citing *Robinson*, the court held that the regulation of a felon's right to possess concealable weapons is a reasonable exercise of the state's "police power." *Id.* at 135; *see also State v. Owenby,* 111 Or App 270, 273, 826 P2d 51 (1992) ("[i]n the exercise of its police power, the legislature may enact reasonable regulations limiting the right [to bear arms]").

Since then, however, the court has rejected reliance on the reasonable exercise of "police power" as a defense to claims of unconstitutionality. *See, e.g., City of Hillsboro v. Purcell*, 306 Or 547, 551, 761 P2d 510 (1988) ("we do not ordinarily make reference to 'police' powers"); *Eckles v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988), *appeal dismissed* 490 US 1032 (1989) ("the existence of [the police] power cannot explain the extent to which the power is constitutionally limited"). The court instead has adopted a more distinctly originalist approach to the interpretation of Article I, section 27, which requires us not merely to determine what is "reasonable" but rather to determine the extent to which the framers would have understood the constitution to constrain the authority of the legislature.

Thus, in *State v. Kessler*, 289 Or 359, 362, 614 P2d 94 (1980), the court held that the meaning of the term "arms" in Article I, section 27, is to be determined by reference to what the framers would have understood the term to mean. Interestingly, in *dictum*, the court noted that the constitutional guarantee of the right to bear arms "does not mean that all individuals have an unrestricted right to carry or use personal weapons in all circumstances." *Id.* at 369. The court did not elaborate, but it did cite as an example its decision in

*Cartwright*, which it characterized as upholding "statutes prohibiting possession of firearms by felons." *Id.* at 370.

Strictly speaking, in that bit of *dictum*, the court characterized *Cartwright* somewhat more broadly than examination of the case will bear out. But, at all events, the issue for us is clear: Does an examination of the historical context of Article I, section 27, suggest that the *dictum* nevertheless is correct?

Resorting to history always is risky business for judges. That is even more the case when the subject is the intended meaning of the constitutional right to bear arms, an area of unparalleled contention—even acrimony—among trained scholars. *See generally* Robert J. Cottrol, *The Second Amendment: Invitation to a Multi-Dimensional Debate, in* 1 *Gun Control and The Constitution: Sources and Explorations on the Second Amendment* ix, ix (Robert J. Cottrol, ed., 1993) (the right to bear arms "is the subject of a vast polemical literature"); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right,* 135 (1994) (according to recent report, "there is less agreement, more misinformation, and less understanding of the right of citizens to keep and bear arms than on any other current controversial constitutional issue").[1] That said, we nevertheless may say with some confidence that there appears to be little debate on the narrow point before us, namely, the right of the state to restrict firearm ownership by felons.

To begin with, the right to bear arms has never been understood to be absolute. The English antecedents to the American constitutional guarantee expressed the right as a conditional one. The Seventh Provision of the Bill of Rights of 1689 proclaimed that "the subjects which are protestants, may have arms for their defen[s]e suitable to their conditions, and as allowed by law." 1 William & Mary, ch 36 (1689) (reprinted in Danby Pickering, ed., 9 *The Statutes at Large,*

---

[1] The debate usually centers on whether the right to bear arms secured by the Second Amendment of the United States Constitution involves a right of individuals to bear arms—a so-called "individual rights" view—as opposed to a right of individuals to bear arms only as members of a militia regulated by the state—a so called "state's rights" or "collective rights" view. For a useful introduction to the variety of scholarship on the debate, see generally *Symposium on the Second Amendment: Fresh Looks,* 76 Chi-Kent L Rev 1 (2000).

*from the First Year of K. William and Q. Mary, to the Eighth Year of K. William III,* 69 (1764)). Likewise, Blackstone's Commentaries—so influential to the development of American law—described a right of "having arms for their defen[s]e, suitable to their condition and degree, and such as are allowed by law." William Blackstone, 1 *Commentaries on the Laws of England,* 139 (reprint 1979) (1765).

The colonies appropriated the English view of the right to bear arms; all of them carefully circumscribed gun production and gun ownership. *See generally* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794,* 16 Law & Hist Rev 567 (1998). For example, they restricted gun ownership by race (whites only), class (no indentured servants), and religious affiliation (frequently Protestants only). *Id.* at 574. They also prohibited firearm ownership by certain classes of persons who were regarded as threats to public order. *Id.* at 574-76. The American Revolution did not change things, as the loyalists discovered when the colonial governments confiscated their arms without compensation. Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture,* 214 (2000).

During the revolution, a number of the states enacted bills of rights to guard against what they perceived as abuses by the British. Commonly, those bills of rights included a right to bear arms. *See generally,* Stephen P. Halbrook, *The Original Understanding of the Second Amendment, in The Bill of Rights: Original Meaning and Current Understanding,* 117, 121 (Eugene W. Hickok, Jr., ed., 1991). Even then, however, it was understood that the right would extend only to law-abiding citizens. As a proponent of a right to bear arms amendment to the Massachusetts Declaration of Rights of 1780 explained: "[W]hile we Continue honest and Lawful subjects of Government we Ought Never to be deprived of them." *Id.*

Similarly, during the ratification debates, a number of the states expressed concern that the constitution contained no bill of rights. Several states explicitly proposed that there be a constitutionally guaranteed right to bear arms.

But the right was understood to be conditioned upon the citizenry continuing to abide by the law. Pennsylvania, for example, proposed that there be a constitutional right to bear arms and that "no law shall be passed for disarming the people or any of them unless for crimes committed." Bernard Schwartz, 2 *The Bill of Rights: A Documentary History,* 665 (1971). Similarly, in the Massachusetts ratifying convention there was a proposal that the constitution never be construed "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Id.* at 681.

Scholars—even those who adhere to an individual rights theory of the right to bear arms—suggest that the assumption that the right to bear arms did not extend to criminals reflects two principles. First, it reflects a principle of classical republican philosophy that the right to bear arms is a right only of the "virtuous" citizen:

> "In classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.' Free and republican institutions were believed to be dependent upon civic *virtu* which, in turn, depended upon each citizen being armed—and, therefore, fearless, self-reliant, and upright. Since possession of arms was the hallmark of a citizen's independence, the ultimate expression of civic *virtu* was his defensive use of arms against criminals, oppressive officials, and foreign enemies alike. One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue."

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp Probs 143, 146 (1986) (footnote omitted). Second, it reflects the common-law principle that criminals, or at least felons, are not citizens to whom the right was guaranteed:

> "Felons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms. Nor does it seem that the Founders

considered felons within the common law right to arms or intended to confer any such right upon them. All the ratifying convention proposals which most explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent."

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich L Rev 204, 266 (1983); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn L Rev 461, 480 (1995) ("felons, children, and the insane were excluded from the right to arms precisely as (and for the same reason) they were excluded from the franchise"); Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale LJ 1131, 1164 (1991) (the right to bear arms, like the right to vote, is a political right conferred on citizens, not on all people without qualification).

At the time of ratification of the Bill of Rights, every state had enacted some form of gun control legislation. The constitutionality of that legislation rarely was challenged and even more rarely rejected. In only one antebellum decision, *Bliss v. Commonwealth*, 12 Ky (2 Litt) 90 (1822), did a court take the position that a state regulation of firearms ran afoul of a state constitutional guarantee of the right to bear arms, but that decision widely was regarded, even at the time, as an aberration. *See, e.g.,* Joel Prentiss Bishop, 2 *Commentaries on the Criminal Law* § 102, 81 (1859). Indeed, immediately after the decision, the people of that state amended the state constitution to permit the legislation. Bellesiles, 16 Law & Hist Rev at 587. More representative are cases in which the courts upheld state statutes limiting the right of arms possession to those whom the law regarded as free citizens and not a threat to society. *See, e.g., State v. Hannibal and Ned,* 51 NC (6 Jones) 57 (1858) (upholding constitutionality of statute prohibiting freed blacks from owning firearms).

■ It was in the foregoing context that the framers of the Oregon Constitution drafted Article I, section 27. Given that context, it is highly unlikely that the framers would have understood the constitution to guarantee an absolute right to arms possession, including to felons. To the contrary, there is every indication that, consistent with the law at the time, the

framers regarded felons as noncitizens, not entitled to the constitutional guarantee of political rights such as the franchise and the right to bear arms. Article II, section 3, for example, specifically mentions that the privilege of an elector is forfeited by conviction of a crime punishable by imprisonment. The debates on the suffrage provisions reflect the common understanding that persons convicted of such crimes "are not citizens; they have been disenfranchised by their crime." Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857,* 174, 176 (reprint 1984) (1926). We find nothing in the text or the history of Article I, section 27, to suggest that its framers would have understood the Oregon Constitution to provide broader protection than what had been established by the Second Amendment and the constitutions of other states, at least insofar as the regulation of a felon's possession of arms is concerned.[2]

We conclude that Article I, section 27, does not prohibit the legislature from barring felons from possessing firearms. The trial court therefore did not err in overruling defendant's demurrer to the indictment based on the asserted unconstitutionality of ORS 166.270(1).

Affirmed.

---

[2] More recently, the legislature has determined that a felony conviction does not necessarily carry with it the consequences that it did at common law. ORS 137.275 now provides that, "[e]xcept as otherwise provided by law, a person convicted of a felony does not suffer civil death or disability, or sustain loss of civil rights or forfeiture of estate or property." In this case, the issue is the constitutionality of a statute that "otherwise provide[s]."