Filed 3/17/16  P. v. Lee CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073202 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F05838) |
| v. | |
| NATHAN JOSEPH LEE, | |
| Defendant and Appellant. | |

Defendant appeals from his convictions of possessing and manufacturing assault weapons.  He contends:  (1) his convictions were based on an unconstitutional delegation of legislative authority to an executive agency that promulgated a regulation which was used in his jury instructions; (2) state law prohibiting the possession of assault weapons violates his constitutional right to possess firearms in his home for purposes of self-defense; and (3) the trial court prejudicially omitted an element of his offense in its jury instructions.  We reject defendant's contentions and affirm the judgment.

1

FACTS

Police officers lawfully searching defendant's bedroom found two firearms they determined were illegal assault weapons. One was a .308-caliber Springfield M1A semiautomatic rifle; the other was a Saiga 12-gauge semiautomatic shotgun. The rifle had rear and forward pistol grips. The shotgun had a folding stock and rear and forward pistol grips. Both firearms in the condition in which officers found them had the capacity to accept detachable magazines. Semiautomatic rifles and shotguns that accept detachable magazines, have rear and forward pistol grips, and have folding stocks are statutorily defined as assault weapons. (Pen. Code, former § 12276.1, subd. (a)(1), (6), (7); Stats. 2002, ch. 911, § 3.)[1]

The owner of the gun store where defendant purchased the firearms testified that when he sold the guns, neither gun had pistol grips. The rifle when sold was able to accept a detachable magazine. The shotgun when sold did not have a folding stock and it had a magazine lock installed.

Defendant testified he purchased the guns and modified them to participate in shooting competitions. He stated that in modifying the guns, he tried to make them legal and not qualify as illegal assault weapons. He knew that in order for his modified rifle to be legal, he would have to make the magazine nondetachable so that a user would have to use a tool or a bullet to detach the magazine as opposed to using just his thumb to press on the magazine release lever.

There were no commercial magazine locks available for the rifle, so defendant attempted to have one made. He had a machinist drill a hole in the magazine release lever, into which he would insert a headless bolt with an Allen wrench and secure the bolt

---

[1] Further undesignated references to sections are to the Penal Code as effective in 2010.

2

with two nuts.  The secured bolt would hold the magazine in place and prevent it from being released without using a tool to loosen the nuts.

Defendant stated that a few days before officers searched his room, he removed the rifle's trigger assembly, which included his custom magazine lock, in order to take it to a gun store to upgrade the trigger.  The store was closed, so he reinstalled the assembly on the rifle.  However, he left off the magazine lock and he did not remove the pistol grips.

Defendant's modifications to the shotgun required him to modify that firearm's trigger assembly.  When he replaced the shotgun's stock, the trigger assembly did not fit the new stock.  He upgraded the trigger and trigger guard, and moved them forward on the gun.  However, this prevented the shroud, which wrapped around the magazine release lever, and the metal clamp that held it in place from fitting onto the gun.  On the same day he sought to take his rifle to the gun store to upgrade the trigger, he took the shotgun's trigger assembly pieces to a friend's house to drill out the clamp so it could attach to the gun and hold the magazine release lever.  After finishing the work, and realizing the gun store had closed, he returned home late.  He did not reinstall the clamp and magazine release lever onto the shotgun because he still had more work to do on them.  Officers searched his room three days later and found the firearms in the condition defendant had left them.

A jury convicted defendant of two counts of possession of an assault weapon (former § 12280, subd. (b); Stats. 2008, ch. 698, § 24), and two counts of manufacturing an assault weapon.  (former § 12280, subd. (a)(1); Stats. 2008, ch. 698, § 24.)  The trial court placed defendant on formal probation for five years and ordered him to serve 180 days in the county jail.

DISCUSSION

I

*Delegation of Legislative Power*

Defendant contends his convictions cannot stand as they were based on an unconstitutional delegation of legislative power.  Defendant's convictions rested on proving his firearms had the capacity to accept "detachable magazine[s]," a statutory characteristic of an illegal assault weapon.  (Former § 12276.1, subd. (a)(1), (6), (7); Stats. 2002, ch. 911, § 3.)  For purposes of the Roberti-Roos Assault Weapons Control Act of 1989 (the Act), the statute defendant was charged with violating, a magazine is "any ammunition feeding device." (Former § 12276.1, subd. (e)(1); Stats. 2002, ch. 911, § 3.)  The Act, however, does not define a "detachable magazine."  The Act grants to the state Department of Justice (the Department) the authority to promulgate regulations necessary for the Act's implementation.  (Former § 12276.5, subd. (c); Stats. 2002, ch. 911, § 3.)  Under that authority, the Department promulgated a regulation that defines a detachable magazine as "any ammunition feeding device that can be removed readily from the firearm with neither disassembly of the firearm action nor use of a tool being required." (Cal. Code Regs., tit. 11, § 5469, subd. (a).)  The trial court relied upon this definition when it instructed the jury on the elements of defendant's charges.

Defendant claims the Department's regulation defining the term was an unconstitutional delegation of legislative authority because (1) the Act did not delegate to the Department the authority to define a detachable magazine; and (2) even if the Act did delegate that authority, the delegation was unconstitutional because defining a detachable magazine was a fundamental policy decision for purposes of adopting and implementing the Act.  Defendant argues the definition was fundamental because it became an element of a felony.  It was also fundamental because developing the definition was a controversial policy decision that did not require the assistance of any agency with

4

special expertise, but it nonetheless required the Department to assign a definition to something that was not intuitively obvious.

We disagree with defendant's argument. The Act lawfully delegated authority to the Department to define a detachable magazine. In addition, the Department's promulgating a regulation defining the term was not an unconstitutional exercise of legislative authority because it was not a resolution of a fundamental policy issue.**²**

The nondelegation doctrine is " 'rooted in the principle of separation of powers that underlies our tripartite system of Government.' (See generally *Mistretta v. United States* (1989) 488 U.S. 361, 371-372 [102 L.Ed.2d 714].) ' "An unconstitutional delegation of legislative power occurs when the Legislature confers upon an administrative agency unrestricted authority to make fundamental policy decisions. [Citations.] 'This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions.' [Citation.]" [Citations.]' (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 632-634.)

"However, '[o]nce it has established the law, the Legislature may delegate the authority to administer or apply the law.' (*Wilkinson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442 (*Wilkinson*).) Therefore, '[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the

---

**²** Defendant did not raise this argument at trial. However, we may consider a constitutional issue raised for the first time on appeal to the extent it presents a pure question of law or involves undisputed facts. (*People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1370.)

implementation of that policy. [Citation.]' (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 190 (*Carson* ); see also *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 491-492.)" (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 804-805 (*Samples*).)

"Doctrinaire legal concepts should not be invoked to impede the reasonable exercise of legislative power properly designed to frustrate abuse. Only in the event of a total abdication of that power, through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation,' and then only to preserve the representative character of the process of reaching legislative decision." (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 384.)

The Act delegated to the Department authority to promulgate regulations necessary for its implementation. The statute stated: "The Attorney General shall adopt those rules and regulations that may be necessary or proper to carry out the purposes and intent of this chapter." (Former § 12276.5, subd. (c); Stats. 2006, ch. 793, § 1.) The term "chapter" refers to the entire Act. Thus, this statute granted the Department authority to promulgate a regulation defining the term "detachable magazine," a term undefined by the statute but requiring definition to carry out the Act's purposes.

The Act's delegation of authority to promulgate regulations, including authority to promulgate a regulation defining a "detachable magazine," was not an unconstitutional delegation of legislative power. The Legislature resolved the fundamental policy issues regarding the use and regulation of assault weapons in adopting the Act, and it provided sufficient direction to the Department to implement the policy by expressing its clear intent. The definition of a "detachable magazine" was not a fundamental policy issue.

The Legislature established its fundamental policy when it adopted the Act – ban assault weapons. It codified its intent in the Act. The Act stated: "The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat

6

to the health, safety, and security of all citizens of this state.  The Legislature has restricted the assault weapons . . . based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.  It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession.  It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities."  (Former § 12275.5, subd. (a); Stats. 2004, ch. 494, § 6.)

The Legislature bluntly clarified its policy in 1999 when it adopted former section 12276.1 to define an assault weapon by its characteristics.  It stated:  "It was the original intent of the Legislature in enacting [the Act] to ban all assault weapons, regardless of their name, model number, or manufacture.  It is the purpose of this act to effectively achieve the Legislature's intent to prohibit all assault weapons."  (Stats. 1999, ch. 129, § 12.)

The Legislature established a fundamental policy to ban assault weapons, and it defined the basic characteristics of an assault weapon as including, among others, a detachable magazine.  It delegated to the Department only the authority to promulgate regulations necessary to implement and enforce that policy.  It did not leave the resolution of fundamental policy issues with the Department.  The Department in turn exercised that lawful authority by defining a detachable magazine.  That definition was not the establishment of fundamental policy.  It was instead an act to implement fundamental policy.  That it was used to define the term "detachable magazine" in defendant's jury instructions did not render it an establishment of fundamental policy.  Defendant suffered no constitutional deprivation from the Department's regulation.

## II

### *Constitutional Right to Bear Arms in Homes*

Defendant contends the Second Amendment right to bear arms, and the Fourth Amendment right and California constitutional right to be secure in one's home against unreasonable searches and seizures,[3] granted him a constitutional right to possess his assault weapons in his home for purposes of self-defense. We disagree. This court has already held the state's ban against possessing assault weapons does not violate the Second Amendment. (*People v. James* (2009) 174 Cal.App.4th 662 (*James*).) Defendant acknowledges *James*, which concerned possession of an assault weapon in a home, but he contends the *James* court did not address a privacy aspect that may attach to possession in a home. He argues we should follow a case from Oregon, *State v. Kessler* (1980) 289 Or. 359 [614 P.2d 94] (*Kessler*), which held the Oregon Constitution's right to bear arms for self-defense preempted a statute that prohibited the possession of a billy club, a weapon the court found was commonly used by individuals for self-defense. (*Id.* at pp. 361-371 [*Id.* at pp. 95-100].)

Defendant overstates the scope of the Second Amendment. In *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637] (*Heller*), the Supreme Court stated an individual's right to possess arms in the home for self-defense does not extend to all types of firearms. It does not extend to firearms that are "not typically possessed by law-abiding citizens for lawful purposes." (*Id.* at p. 625.)

The Second Amendment right "is the right to possess and carry weapons typically possessed by law-abiding citizens for lawful purposes such as self-defense. [Citation.] It protects the right to possess a handgun in one's home because handguns are a 'class of "arms" that is overwhelmingly chosen by American society' for the lawful purpose of

---

**3**  California Constitution, article I, section 13.

8

self-defense." (*James, supra,* 174 Cal.App.4th at p. 676.)  Unlike in *Kessler*, where the court determined for purposes of the Oregon Constitution that billy clubs were commonly used for self-defense, there is no evidence in the record that assault weapons have been typically possessed by law-abiding citizens for the purpose of self-defense.

"Although *Heller* adverted to self-defense as a core interest promoted by the Second Amendment [citation], other courts have acknowledged that 'it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances.  By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense.  Possession of machine guns or short-barreled shotguns – or any other dangerous and unusual weapon – so long as they were kept in the home, would then fall within the Second Amendment.  But the Supreme Court has made clear the Second Amendment does not protect those types of weapons.' [Citation.]  We agree that, when a weapon falls outside the class of weapons entitled to Second Amendment protections [which an assault weapon does under the holding of *James*], neither the place in which it is stored nor the purposes for which it might be used imbues the weapon with Second Amendment protections." (*People v. Zondorak* (2013) 220 Cal.App.4th 829, 837.)

The fact that police lawfully found defendant's assault weapons in his home did not imbue him with Second Amendment and Fourth Amendment protection against the Act's prohibitions.

III

*Instructional Error*

Defendant contends the trial court committed instructional error when it did not instruct the jury regarding possessing and manufacturing an assault weapon in the case of the rifle that to be an illegal assault weapon, the rifle had to be semiautomatic.  Defendant claims this error went to a necessary element of the crime and thus is subject to review under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].

9

Any error by the trial court on this point was harmless beyond a reasonable doubt. The evidence conclusively established the rifle was semiautomatic. The rifle was manufactured and sold as a semiautomatic, and it functioned as one. In closing argument, defense counsel referred to the rifle as a semiautomatic. And in his opening brief here, defendant referred to both of his firearms as "semiautomatic weapons."

In addition, the prosecutor informed the jury in her closing argument that in order for the rifle to be an illegal assault weapon, it had to be semiautomatic, and that the rifle was in fact semiautomatic. (See *People v. Aranda* (2012) 55 Cal.4th 342, 365 [content of attorneys' closing argument may be considered in determining harmlessness of instructional error].) Under these circumstances, where the jury knew the rifle was semiautomatic and had been told of the need to find it so, the instructional error was harmless under the federal constitutional standard.

DISPOSITION

The judgment is affirmed.


                                                              NICHOLSON         , Acting P. J.



We concur:



        ROBIE           , J.



        HOCH            , J.



10